wtk

18

1   9:30, the attorney's office called and told grandma

2   that she should not participate in any type of

3   meeting.   And I did-

4            HEARING OFFICER DuBOW: Are you going to

5   have-I'm trying to write all these dates down and

6   you're going a little fast.   So, let me just-could

7   you recount your testimony on the dates?   When did

8   you meet with the grandmother?

9            THE WITNESS: Well, the grandmother-I did

10  not meet with the grandmother.   I did not meet with

11  her because her attorney advised her not to.

12           HEARING OFFICER DuBOW: Okay, that's fine,

13  but I wanted you to go before that.   You said you

14  obviously talked to the grandmother and she said

15  she was available June 10,is that right?

16           THE WITNESS: No, June 20.

17           HEARING OFFICER DuBOW: Wait a minute.

18           MS. PUCKETT: June 10 was the day she sent

19  the letter to the attorney's office.

20           HEARING OFFICER DuBOW: Wait a minute, is

21  that in the-

22           MS. PUCKETT: Yeah, that's the letter of

19

wtk

1  invitation is DCPS-01 and the letter that was sent

2  to Ms. Houck's office and the confirmation is

3  DCPS-02.

4         HEARING OFFICER DuBOW: All right, one

5  second, let me just go over that. Hold on, so it

6  was sent, letter of invitation, June 10, to

7  grandmother and attorney. You sent it to both?

8         THE WITNESS: No, I spoke with the grandma.

9         HEARING OFFICER DuBOW: Okay, hold on.

10         THE WITNESS: Actually, I did send it to

11  both, it's addressed to both. But I spoke with the

12  grandma specifically because I wanted to, at least

13  let the attorney's office know, that grandma was

14  available on this date-

15         HEARING OFFICER DuBOW: Okay, wait, wait,

16  wait, wait-

17         THE WITNESS: Okay.

18         HEARING OFFICER DuBOW: Say, grandma was

19  available what date? You talked to-you talked to

20  the grandmother?

21         THE WITNESS: I spoke with her, mm-hmm.

22         HEARING OFFICER DuBOW: Okay.

wtk

1          THE WITNESS: I spoke with grandma.

2          HEARING OFFICER DuBOW: Okay, you spoke to

3    the grandmother and she said she was available,

4    June 20?

5          THE WITNESS: Right. I spoke with her,

6    right, she was available on June 20 at 9:30.

7          HEARING OFFICER DuBOW: At 9:30, I just

8    wanted the dates. And then what happened? You

9    sent out the letter-

10          THE WITNESS: I'm sorry.

11          HEARING OFFICER DuBOW:  -June 10, then

12    what happened?

13          THE WITNESS: On, yeah, I mailed out the

14    letter on-I faxed the letter on June 10, I got the

15    confirmation and on June 20, that date rolled

16    around and grandma did come to the meeting. As

17    grandma was coming to the meeting, I received a

18    phone call from the attorney's office telling her

19    not to participate in the meeting. They, in fact,

20    called my office, which was the first time I had

21    ever heard from them, advising her not to

22    participate in any meetings.

wtk

1        And the rationale between getting this

2   information and trying to schedule a meeting is

3   because of the fact that, summer was quickly

4   approaching and if there were any concerns or

5   anything that we should try to work on before the

6   summer came, that was my effort to kind of close

7   out everything before summer.

8        So, the fact that they would tell her on

9   the 20 not to participate, they had ample time, to

10  contact me but would contact me on the 20, that was

11  pretty disheartening.  If there was concern and if

12  there was a real desire to have a meeting.

13       HEARING OFFICER DuBOW: One second.  You

14  didn't talk to the lawyer, the lawyer just talked

15  to the grandmother when they called is that what

16  you're saying?

17       THE WITNESS: No, I spoke with someone from

18  the attorney's office, I believe it was-I don't

19  know if it was a secretary or whoever, I do

20  remember because the person was fairly rude when I

21  was trying to explain to them, look I had sent you

22  all ample-I'd given you all ample time and I faxed

wtk

22

1  this information and I thought that was pretty

2  unfair to the child to call on that day to tell the

3  grandparent not to have the meeting.

4        I did speak to someone from that office

5  because I felt that was really, just kind of poorly

6  carrying out, to call on that day when there was

7  ample time to have any discussion, even to say that

8  we can't do it on that date, can we do it on this

9  date.

10       HEARING OFFICER DuBOW: Did they have

11  any-you had another date here, June 21 was the last

12  date on your letter of invitation, right?

13       THE WITNESS: I had three dates.

14       HEARING OFFICER DuBOW: Right, the last

15  date is June 21.

16       THE WITNESS: June 21, mm-hmm.

17       HEARING OFFICER DuBOW: Was there any

18  discussion with the lawyer's office relating to

19  that date?

20       THE WITNESS: There was no discussion at

21  all until the day of the day of the 20 when they

22  simply told the grandparent not to participate and

23

wtk

1  then, in my conversation.  There was no

2  conversation in terms of-the person I was talking

3  to was not having a conversation about doing it the

4  next day.

5       The conversation was she's not

6  participating and we didn't confirm any meeting

7  with you.  And so I simply said, well, can you all

8  contact us.  Because at that point it was really

9  not a pleasant conversation.  At that time, it was

10  just pretty much to tell the grandma not to

11  participate or to say do not have a meeting with

12  this grandparent, we're not.

13       HEARING OFFICER DuBOW: My only question

14  is, on June 20,when they called, did they state a

15  reason why they could not come?

16       THE WITNESS: There was not a reason why

17  the could not have come.

18       HEARING OFFICER DuBOW: No, I didn't ask

19  that.

20       THE WITNESS: If they could have come on

21  the 21, that would have been available.

22       HEARING OFFICER DuBOW: I understand that,

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802

wtk

24

1  that wasn't my question.

2      THE WITNESS: Oh, okay.

3      HEARING OFFICER DuBOW: My question was,

4  you said you talked to someone from their office.

5  My question was, when they called on 6/20, did they

6  state a reason why they couldn't be available on

7  that date?

8      THE WITNESS: No, they did not.

9      HEARING OFFICER DuBOW: Okay, that's all.

10      MS. PUCKETT: Can I continue?

11      HEARING OFFICER DuBOW: Yeah.

12      BY MS. PUCKETT:

13  Q    And what was the purpose of that meeting?

14  A    The purpose of that meeting was to have a

15  multi-disciplinary team meeting to discuss any

16  concerns that were presenting themselves, because,

17  I had kind of seen the grandma in the neighborhood,

18  actually, behind the school, because I was a little

19  taken aback by, just getting the request and

20  knowing that the grandma had gotten an attorney and

21  so I had actually asked grandma, well, what's going

22  on? And she said, pretty much, that she wanted

25

wtk

1  placement for all of her grandchildren.  And, so,

2  pretty much, the meeting was really to explore what

3  the concerns were.

4      Q   Has anyone contacted you since this

5  meeting to schedule a meeting about these concerns?

6      A   No, no one has.

7          MS. PUCKETT: I have no additional

8  questions at this time.

9          HEARING OFFICER DuBow: Cross examine.

10              CROSS EXAMINATION

11      BY MR. TIERKA:

12      Q   Ms. Gregory, this is Doug Tierka, I'm

13  counsel for Ms. Peak.

14      A   Okay.

15      Q   You're obviously not M͟      's teacher,

16  correct?

17      A   No, I'm not M.        s teacher.

18      Q   You sat in his class for one day, that's

19  been your observation of him?

20      A   Well, I haven't, no, actually, I observe

21  all of the children because I'm the

22  special-education coordinator, and, so, because I

26

wtk

1    oversee that program, I pretty much, on a daily

2    basis, do one of my kids and particularly when

3    they're in their resource class. Mi          class

4    is, like, probably eight feet from my office. So,

5    I've had, numerous times observed Michael, but I

6    had a particular observation, and I was in his

7    class, probably closer to the end of the summer,

8    maybe the last week of school.

9        Q    And you're saying the first indication

10   that you had of his behavior being a problem was

11   when you got contacted by counsel?

12       Q    The first indication that the grandma had

13   an issue as it related to M:      - was when I was

14   contacted by counsel.  We have—we have contact

15   regularly with our grandparents—with our Parent.  I

16   met with, Ms. Peak sat in on a meeting on Jan 25,

17   2005, and that discussion did not present itself,

18   either by Ms. Peak—the only indication Ms. Peak

19   made was she felt like he was doing a whole lot

20   better and that there was some concern that M:

21   wasn't bringing his homework home.

22           Both of his teachers indicated that

27

wtk

1   Mi          behavior, he was doing well with his

2   behavior.  His behavior was improving.  And this

3   was a child who-this was his first transition into,

4   kind of special-ed resource, so there was an

5   indication in January that things were going well.

6       Q    You never had an indication from Ms. Peak

7   that there was any problem in M         school

8   performance?

9       A    Ms. Peak did not, no.  And Ms. Peak could

10  easily contact me if she ever needed a contact-or

11  copies of IEPs or anything of that nature.  If

12  there was any concern, Ms. Peak has always known,

13  not just with me, but anybody at the school that

14  she could-she pretty much has carte blanche,

15  because she's a participant in the community and

16  she really participates in a lot of things that

17  take place within our school.

18      Q    You said she visits the school right?

19      A    I'm sorry?

20      Q    You said she comes to the school?

21      A    She does.

22      Q    She comes very often, doesn't she?

28

wtk

1     A    She has, mm-hmm.

2     Q    She's come many times, because of

3    Michael's behavior, hasn't she?

4     A   I wouldn't say that, necessarily.  No, she

5    comes.  She's participated-she participates in a

6    lot of our parent activities, a lot of our school

7    functions, as well.

8     Q    Do you know-

9     A   In fact the date that I saw her to ask

10   about a meeting, it was at a school function.

11    Q    Do you know her to ever come because she

12   was called because of M   behavior?

13    A   I am sue that it possibly could happen,

14   specifically if there's an interaction.  I'm not

15   necessarily always aware.  I see Ms. Peak in the

16   morning at the bus-stop as I'm going past.  So

17   there are numerous interactions that Ms. Peak has

18   just in terms of being at the school or being near

19   or around the school.

20    Q    Let's go one at a time.

21    A   Okay.

22    Q    Do you know of any time that Ms. Peak has

wtk

1    come to the school because she was summoned there

2    because of M_____ behavior?

3         A    I'm not aware of any specific time, no.

4         Q    You just testified that you wouldn't

5    necessarily know if that were the case?

6         A    No, not unless it was a continuing issue

7    that someone would come to me, like the

8    administrator would say, we may need to take a

9    closer look at this. But not, no, not because of

10   particular behaviors. No, I don't know. Not

11   unless it was a continued issue.

12        Q    And what about from the school side? The

13   school made remarks about M_____ behavior long

14   before you heard from an attorney, correct?

15        A    I'm sorry?

16        Q    Didn't the school make note of behavior

17   problems before you ever heard from Ms. Peak's

18   attorney?

19        A    Could you elaborate?

20        Q    Well, do you know of anytime when the

21   school made note of M_____ behavior being an

22   issue in class, before you heard about it from Ms.

wtk

30

1  Peak's attorney?

2      A     Students may have behavioral difficulties

3  or may have difficulties.   But the issue is not

4  whether it's-the issue is whether it's an ongoing

5  or whether it's a particular issue.   So, I know

6  that there are, at times, that our children have

7  behavior problems.   And I would not say that

8  M:        has not had any behavioral difficulties.

9  But part of being in the school and working in the

10  school system and the school setting, is that you

11  work together with your parents and with your

12  teachers to address any issues.

13          Now, if it's a presenting or if it's an

14  ongoing problem, then it's something that needs to

15  be brought to the table, either by a teacher, or

16  either by a parent.   And so, even in January 25,

17  that issue was not presented or brought to the

18  table by the Parent and any addressing of any

19  behavior was to say that he's moving up; he's doing

20  pretty well.

21      Q     So, my question is, had teachers made note

22  of behavior problems with M:           —

wtk                                                          31

1      A    According to the meeting that, M

2      Q    No, I'm not asking just according to the

3  meeting, I'm asking ever-

4      A    Specifically to me-

5      Q    -wait, wait, wait-has a teacher ever made

6  note of behavior problems with M

7      A    Oh, I'm sure that M         may have had a

8  discipline issue from-periodically during the

9  school year that he may have had to be disciplined.

10  But on a continuum, no, it wasn't a presenting

11  problem.

12     Q    Now, I'm looking at-

13     A    But I won't say that M         had sailed

14  through the school year without any difficulties-I

15  mean, I won't say that he had sailed through the

16  school year and not had any, not had to be

17  disciplined or participate in any behavior or-maybe

18  a teacher may not have had to call and have a

19  conversation with his parents.  That would be a

20  usual for a lot of children that we work with.

21  Pretty much because if there's, if a child is

22  transitioning, then you do want to let parents know

111

32

wtk

1  or care givers know.

2      Q    But for the typical student who's just

3  having a typical behavior problems, a teacher

4  wouldn't note that on their report cards would

5  they, if it was just the occasional behavioral

6  issue?

7      A    I think if you want to stay on top of

8  something, I think it is good to note because you

9  want to let the Parent or the care giver know, that

10  this is something that may need to be worked on or,

11  let's keep this child on task.  Or this child may

12  have had an issue with this-this child is

13  improving.  So, I think, just to effectively

14  communicate with parents, I think that you should

15  note many things that go on.

16      Q    Now, if there was a behavioral problem

17  that was occurring most mornings or was happening

18  often, you would consider that an unusual behavior

19  problem?

20      A    If something was happening most mornings,

21  I would say, yes.

22      Q    I want to ask you a question about the

wtk

1   meeting invitation you were talking about before?

2       A    Mm-hmm.

3       Q    That meeting, that's a standard DCPS form,

4   correct?

5       A    Letter of invitation, that's correct.

6       Q    For the record, I'm referring to DCPS-01.

7   And there's a number of check boxes there

8   indicating the purpose of the meeting, correct?

9       A    Mm-hmm.

10      Q    And the procedure is to check the boxes

11  that indicate everything that's going to be done at

12  that meeting, correct?  That's standard procedure?

13      A    Yes.

14      Q    Also, when you send out a letter of

15  invitation, after a date has been picked, you send

16  a letter of confirmation, do you not?

17      A    The date was not picked because it was not

18  confirmed by the attorney.

19      Q    No, that's not my question.  My question

20  is your standard procedure.  Following a letter of

21  invitation-

22      A    Mm-hmm.

34

wtk

1      Q    -a date is decided through some process,

2  correct, either by agreement with counsel or the

3  Parent or-

4      A    If a date is confirmed-

5      Q    -hold on, let me finish my question,

6  please.

7      A    Mm-hmm.

8      Q    -you decided on a date in some fashion,

9  correct, either by agreement with Parent or counsel

10  or DCPS just sets it, correct?  That's standard

11  procedure?

12      A    The standard procedures is that you set

13  out a letter of invitation giving several dates.

14  If a person has an attorney, then you usually, the

15  information is sent to the attorney is to please

16  make all contacts or establish meeting dates

17  through that person.  So, if it is confirmed, you

18  send out a letter of confirmation, if the attorney

19  has confirmed it.

20      Q    So, when you send a letter of invitation--

21      A    Mm-hmm.

22      Q    --and you did not get agreement with

1   counsel--

2        A     Mm-hmm.

3        Q     --you still set a meeting anyway, correct?

4        A     No, this is what I did-

5        Q     No, no, no, I'm asking about your general

6   procedure, ma'am.

7        A     But you're asking me what I did.

8        Q     No, I'm asking about your general

9   procedure.

10       A     Okay, could you repeat that?

11       Q     My question is, when you have made an

12  attempt to schedule a meeting--

13       A     Mm-hmm.

14       Q     --but you cannot get the cooperation of

15  counsel, your procedure is to set a meeting anyway,

16  is that correct?

17       A     I'll tell you what my procedure is, is I

18  try to attach letters to-in addition to the

19  letter-of-invitation, so that I can have some type

20  of dialogue to let whoever I'm speaking with

21  generally the counsel, let them know that, this is

22  up for discussion.  This is something that we could

36

1   discuss in terms of the time. I don't like to

2   arbitrarily just set meeting dates without the

3   benefit of having some dialogue.

4          I do that at times when there's not been a

5   response, but this was my first attempt. And, so,

6   with trying to-even after having conversation on

7   the-the office stated not to have participate in

8   the meeting, to have some type of dialogue centered

9   around scheduling a date so that-because basically,

10  the primary goal is to sit down and have a

11  discussion with regards to the child, not to go

12  back and forth trying to calendar dates.

13      Q    So then when it's made-when you've only

14  made one attempt, you're saying it's not your

15  procedure to then set a meeting?

16      A    No, it is my procedure to send out another

17  letter of invitation.

18      Q    Okay, so-

19      A    But I also did ask for the counsel to

20  contact the office.

21      Q    But in this case, you only sent out the

22  one letter of invitation, correct?

116

1      A     That's right, right before the end of

2   school.

3      Q     Okay.  And then you set a meeting without

4   coordinating with counsel because in your

5   testimony, you did not get a response, correct?

6      A     Well, I think my attempt to mail a letter

7   and to send out a letter of invitation was an

8   attempt to coordinate with counsel.

9      Q     Ma'am, my question is, you set a date for

10  the meeting, correct, for June 20?

11     A     I set a date with the meeting because I

12  sent a letter saying, we would set it if I didn't

13  hear from you, as an attempt to kind of spur

14  someone to have a dialogue.

15     Q     Ma'am, I think we can go a little bit

16  faster if you can just focus on my questions.  I'm

17  asking shorter questions. You did, in fact,

18  schedule the meeting, correct-for June 20?

19     A     I scheduled a meeting, I did.

20     Q     Now, standard procedure, when a meeting is

21  scheduled-

22     A     Mm-hmm.

1      Q     After you've done an invitation--

2      A     Mm-hmm.

3      Q     --and a meeting is scheduled, you then

4  send a meeting notice, correct?

5      A     I scheduled-the meeting was scheduled

6  tentatively.  Hoping that the Parent-it was not

7  confirmed because I had not received any

8  information from Ms. Peak's attorney.

9      Q     Okay.

10     A     But Ms. Peak did, in fact, show up.  We

11 had blocked out that time hoping that Ms. Peak had

12 possibly had dialogue with her attorney and that

13 they would come.  Even though they had had no

14 discussion with us.  The hope was that, perhaps,

15 through the Parent that she would also help to

16 facilitate.  So the meet-the block was there, our

17 team was available, that's our standard meeting

18 dates.  Our team was available, the time was

19 blocked out.  Ms. Peak, indeed, showed up.  It's my

20 understanding that she had a conversation or else,

21 I'm not sure how else they knew to call the school

22 at that particular time to tell her not to

wtk                                                          39

1   participate.  So, I know that she must have had

2   some dialogue with her attorney's office in order

3   for them to call at that specific time to tell her

4   to not participate.

5        Q    But there's not-but you didn't send

6   anything out saying the meeting would be the 20?

7        A    I did not.

8        Q    I'd like to ask you about the fax

9   confirmation that you received.  There's something

10  that we have here at the hearing, with us, I'm not

11  sure if you have it with you, do you have that with

12  you?

13       A    The fax?

14       Q    We have with us, and I'm referring to-part

15  of DCPS-02.  I have a fax confirmation sheet.  Do

16  you have that there with you, ma'am?

17       A    I do.

18       Q    Can you explain to me why I see two

19  different dates here.  On the top right, I see, it

20  says time 6/14/05, 15:56, which I guess is 4;56?

21       A    Okay, I don't have that one.  The one I

22  that I have, says 6/10/2005, 15:56.

1       Q    Yeah, I see that, that's kind of within

2    the box, correct?

3       A    No, that's not within the box.  Right

4    outside of the box, doesn't it say transmission

5    verification report, it says that at the top.

6    Right underneath that on the right-hand side, it

7    says time "colon," then it has 06/10/2005, 15:56.

8    If you go within the box, it has date, time, and if

9    you move over it says 06/10/and it has 15:55, then

10   it goes to the fax number and name and it has the

11   number 301-951-4248 and duration; 00:01:08

12      Q    I must have a bad copy, so I can just have

13   a second.

14          MR. TIERKA:  Can I just check that,

15   Hearing Officer, against your copy, because [OFF

16   MICROPHONE]

17          THE WITNESS:I have a copy right here-

18          MS. PUCKETT: No, we have a copy right

19   here.

20          MR. TIERKA: No, no, that's fine, it's just

21   a photocopy that I have.

22          BY MR. TIERKA

MILLER REPORTING CO., INC.
735 8th STREET, S.E.

wtk                                                                41

1        Q    Now, outside of that fax confirmation, do

2    you have-do you have an independent recollection of

3    calling or faxing at that time?

4        A    I made a phone call and left a phone

5    message on the voicemail shortly before that time.

6        Q    But, what I'm asking is, did you-well, let

7    me ask this: Did you send this fax yourself?

8        A    Yes, I did.

9        Q    And your fax number is as it appears on

10   this letter here in DCPS-02?

11       A    645-7219-202?

12       Q    Just hold on for one minute, ma'am.

13       A    Sure.

14       Q    Ma'am, earlier you said that you received

15   word that a meeting was requested and that's why

16   you scheduled this meeting?

17       A    I received-I believe I received

18   documentation, that might it in the other file,

19   stating that they-that Ms. Peak was now being

20   represented.  And so, I did see her in the parking

21   lot right behind the school and I was-I asked her

22   what was going on.  And she said, she wanted

121

wtk                                                                    42

1   placement for all her kids and-well, she actually

2   said with the exception of Tatianna ph, Tatianna,

3   she felt was fine.  And, so, I said, well, let me

4   schedule a meeting and see what we can work out.

5   I've never been opposed to my team, the parents

6   that I work with, they know that if there's an

7   issue then, I'll schedule a meeting, that's what

8   we're here to do.

9       Q    And it was clear to you she wanted to

10  discuss placement?

11      A    Yeah, for all, I mean, I have a running

12  dialogue because I pretty much know all of the

13  children, you know.  We had a conversation about,

14  pretty much all of the kids and so she pretty much

15  said that she wanted placement for all of her

16  children, except-well, she said except for

17  Tatianna, who she felt was doing fine.

18          MR. TIERKA: I have no further questions.

19          HEARING OFFICER DuBOW: Any redirect?

20                  REDIRECT EXAMINATION

21          BY MS. PUCKETT:

22      Q    You indicated that she said she said she

wtk                                                                 43

1   wanted placement.  Did she say what type of

2   placement?

3       A    Well, I know her kids-two other kids are

4   already in DCPS placement, so I assumed that she

5   was talking about private placement, particularly

6   as it relates to one other child who is in a DCPS,

7   placement.  So-based on the conversation, I assumed

8   that it was private placements.

9       Q    And you indicated that you wasn't aware of

10  any behavior concerns.  Had anyone indicated to you

11  any behavior concerns that would have warranted

12  additional testing?

13      A    No, because when we sit at the table,

14  that's always-if there's concern, M▇▇▇▇▇ doesn't

15  receive any psycho-social counseling.  So, if that

16  was-if that concern was presented, we could have

17  and in the least have added psycho-social

18  counseling to his IEP to see if that would help

19  alleviate any behavioral concerns.  But the whole

20  meeting was just so-it was on such a high end

21  because everybody was saying how well he was doing,

22  how much progress he had made.  So, I facilitate

wtk                                                                          44

1   meetings and I kind of keep my thumb on the pulse

2   of what's going on.  But it is the Parent and the

3   teachers that really have an understanding of

4   what's going on.  And so, if that problem presented

5   itself-and I don't think in any way shape or form,

6   Ms. Peak feels like she can't have any conversation

7   with myself or any staff, because she's so much a

8   part, of Malcolm X.

9           So if there had been any indication that

10  this was something that he was digressing versus,

11  making progress--then we could have, in the least,

12  looked to say, okay, let's see if some

13  psycho-social counseling will--let's monitor this

14  to see if this will and look at some specific

15  issues to see if this will help improve the

16  situation; so that, if there is some difficulties

17  that are presenting themselves, we now have some

18  documentation to kind of support any additional

19  testing that may be needed.

20          But that conversation did not present

21  itself in the IEP meeting that we had.

22          MS. PUCKETT: Okay, thank you, I have no

wtk

45

1  additional questions.

2          HEARING OFFICER DuBOW: Thank you very

3  much.

4          MS. PUCKETT: Oh, and I'm sorry, and Ms.

5  Gregory, I'm going to be calling you once

6  the-Tatianna hearing starts.

7          THE WITNESS:  Okay, thank you.  Am I

8  finished now?

9          MS. PUCKETT: For M;        yes.

10          THE WITNESS: Okay, great, I can get back

11  to my teacher orientation.

12          MS. PUCKETT: I'm sorry.

13          THE WITNESS: Thank you, bye, bye.

14          HEARING OFFICER DuBOW: Was that your case?

15          MS. PUCKETT: Yeah, I don't have any other

16  witnesses.

17          HEARING OFFICER DuBOW: Mr. Tierka?

18          MR. TIERKA: Let's call--I'm going to be

19  calling Ms. Peak in a moment, but, I'd like to call

20  Carolyn [ph] Houck and now we do have this issue,

21  and we can deal it many different ways--I'm fine

22  [Off mike, unintell.] notice that DCPS will be

125

wtk

1   allowed to present opposing documentation or

2   reconvene the hearing if they want to contest it,

3   have you given it in different ways-but I think the

4   document is important because, not only do I have

5   Ms. Houck' testimony that she did not receive this

6   invitation, but, as I said, I have a fax report

7   right here that shows all of the faxes from June 9

8   to June 20.

9           HEARING OFFICER DuBOW: It's not disclosed,

10  it can't get in.

11          MS. PUCKETT: I'm going to object to it

12  coming in and also object for the record as to Ms.

13  Houck's testimony at this hearing.  She does

14  represent the petitioner at this point.  And I

15  think it would be inappropriate for her to testify

16  at this hearing.

17          MR. TIERKA: I'd like to respond to that.

18  If the disclosure issue, I would ask that the

19  hearing be continued to allow the document to be

20  disclosed.  I don't think the disclosure rules were

21  designed to allow for one side to present-

22          HEARING OFFICER DuBOW: Well, there is a

47

1  question I have, counsel.  If you didn't get it,

2  how did you know to call her on the day of the

3  hearing?

4  MR. TIERKA: Because Ms. Peak informed-I

5  don't want to get too far [Unintell.] into it

6  because-

7  HEARING OFFICER DuBOW: Well, then put Ms.

8  Peak on, ask her what she talked to counsel for.

9  When she told them about the meeting, if you wish

10  to do that.

11  MR. TIERKA: Well, we're getting into

12  complicated privilege issues, but-

13  HEARING OFFICER DuBOW: Well, privilege

14  issues, but you want-you know, I have here a

15  document that says that it was received by your

16  office, right?  Now you want to introduce another

17  document that's not been disclosed, right?

18  MR. TIERKA: Correct, but-again, we'd be in

19  a situation then of both sides disclosing

20  every-exposing documents to account for every

21  possible representation by either side, which is an

22  impractical impossibility.  So, I understand the

wtk                                                                    48

1    five-day disclosure rule and the purpose of it.

2    And that's why I am proposing that DCPS be given

3    time to review it.  What has happened, when things

4    have been left out of disclosure by mistake—and

5    this is not that case—it's not a mistake.

6          HEARING OFFICER DuBOW: So, what you're

7    telling me is I'll get their document, which is

8    indirectly that says that the fax went through on

9    June 10.  And then you're going to submit a

10   document that says it's not listed on whatever

11   piece of paper you have on fax transmittals.  And I

12   have to decide which of the two is correct, is that

13   what you're telling me?

14          MR. TIERKA: Yes, sir.

15          MS. PUCKETT: DCPS is—

16          MR. TIERKA: To the degree that it's

17   relevant.  I actually don't think that it's

18   relevant.

19          MS. PUCKETT: I think that, I mean, it

20   doesn't—I would object to any continuance in this

21   case because even if the document was—

22          HEARING OFFICER DuBOW: I'm not continuing

MILLER REPORTING CO., INC.
735 8th STREET, S.E.

wtk                                                              49

1   the case.

2        MS. PUCKETT: Because the document, it

3   might be relevant, but we have testimony-I mean,

4   this meeting was not a meeting that was required

5   that we have.  It was based on some concerns when

6   Parent-when the special-ed coordinator received

7   something from Parent's counsel.  So, she scheduled

8   a meeting to find out what's going on.  And I think

9   she clearly indicated that.  And she also clearly

10  indicated that the Parent's counsel's office

11  contacted at that exact time, so they were aware of

12  he meeting not matter when they were aware of the

13  meeting.  The meeting-they knew about the meeting.

14  They knew we were trying to have a meeting to-

15        HEARING OFFICER DuBOW: I don't know if

16  that's so, but the document can't come in because

17  of the five-day rule and I'm not continuing the

18  case.  So, if you want to call a witness, that's

19  all right.

20        MR. TIERKA: I will, I'm calling Carolyn

21  HOUCK.

22        MS. PUCKETT: And Im just objecting for the

MILLER REPORTING CO., INC.
735 8th STREET, S.E.

50

wtk

1  record to Ms. Houck testifying.  I think she's

2  inappropriate-

3          HEARING OFFICER DuBOW: Well, if Ms. Houck

4  is going to rely on this document-is she going to

5  rely on this document?

6          MR. TIERKA: Ms. HOUCK is going to testify

7  that she never received the invitation.  I will

8  note that, I've heard that DCPS-

9          HEARING OFFICER DuBOW; You want me to put

10 her under oath?

11         MR. TIERKA: Rule 3.7(b) of the D.C. Rules

12 of Professional Conduct, allow for one member of a

13 firm to take testimony of another member of the

14 firm as long as the member testifying is not

15 conflicted with the client.

16         MS. PUCKETT: I think it would be

17 conflictive with the client, because, although Mr.

18 Tierka is here representing the client, here at the

19 hearing, I believe that Ms. Houck does all the work

20 prior to the hearing and I think it's a big

21 conflict.

22         HEARING OFFICER DuBOW: I think it's highly

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON D.C. 20003-2802

wtk                                                              51

1   unusual-I think it's highly unusual.

2           MR. TIERKA: I don't see where the conflict

3   is, though, the conflict would imply that Ms. Houck

4   has some interest that is contradictory to some

5   interest of Ms. Peak's and I can't imagine what

6   that would be.

7           HEARING OFFICER DuBOW: Are you sure you

8   want to put Ms. Houck on?  If you want to put her

9   on, you can put her on.  I ain't stopping her.  Im

10  just saying are you sure you want to do it before

11  you do it?

12          MR. TIERKA: Im sure.

13          HEARING OFFICER DuBOW: Okay, you take the

14  risk, go ahead put her on.

15          [Break.]

16          HEARING OFFICER DuBOW: We're back on the

17  record.

18          Whereupon,

19                  CAROLYN HOUCK

20  was called as a witness and, having been first duly

21  sworn by the Hearing Officer was examined and

22  testified as follows:

52

1        HEARING OFFICER DuBOW: Your witness.

2    Please state your name for the record.

3        THE WITNESS: Carolyn Houck

4        HEARING OFFICER DuBOW: Your witness.

5                    DIRECT EXAMINATION

6        BY MR. TIERKA:

7        Q    Ms. Houck, you're the attorney for Ms.

8    Peak, in M;        P      s case?

9        A    Yes.

10        Q    Do you regularly receive meeting

11    invitations from DCPS?

12        A    Yes.

13        Q    Do you regularly receive them by fax?

14        A    Always.

15        Q    What is your office procedure for dealing

16    with those invitations, as they come in?

17        A    Well, I put them in a separate file for

18    meeting invitations.  I take fax confirmation-well,

19    I get a printout of all my meeting invitations-I

20    mean, confirmations of the fact that I received a

21    fax.  I put that in a special, fax confirmations.

22    I take a look at the meeting invitation and I call

132

1   the Parent and I call, almost always, I call Sharon

2   Millis [ph], the advocate and discuss with her the

3   fact that we need to respond to the meeting

4   invitation.  And either Ms. Millis or I respond to

5   the invitation.

6       If I respond to the invitation, I keep a

7   fax confirmation.  If Ms. Millis responds to an

8   invitation, she sends me the fax confirmation, with

9   a response.

10      Q    And why do you keep fax-you said you keep

11  fax confirmations of incoming invitations?

12      A    I keep fax confirmations of all incoming

13  faxes and all outgoing faxes.

14      Q    Why is that?

15      A    Um, well, for outgoing faxes-

16          HEARING OFFICER DuBOW: Well, Just-

17      Q    -just to confirm that I sent the fax, but

18  incoming faxes oftentimes I'll receive a fax,

19  especially from a DCPS school that doesn't have the

20  right date on the heading.  For instance, I've

21  received faxes that have dates, 2010, 1995, so in

22  order to make sure that I know exactly when I

wtk                                                                    54

1    receive a fax, I have a print-I have a confirmation

2    printed out and also the heading and the cover of

3    the fax that comes in.  I just keep it for my

4    records in case I ever need to confirm a fax

5    outgoing and incoming.

6         Q    You're aware that in the case of M███████

7    Peak, there was a meeting invitation disclosed as

8    part of DCPS's disclosures?

9         A    Yes, I am.

10        Q    When did you first see that meeting

11   invitation?

12        A    With the disclosures.

13        Q    After receiving the disclosures, did you

14   check M█████████ file for a copy of that meeting

15   invitation?

16        A    Yes, I did.

17        Q    Is there any such meeting invitation

18   existing in his file?

19        A    No.

20        Q    After checking the files, did you run any

21   kind of report from your fax machine to check

22   whether you had received such a fax?

wtk                                                              55

1        A     Well, what I did was-

2              MS. PUCKETT: Objection,

3              HEARING OFFICER DuBOW: Wait, wait, hold

4    on, I have an objection.

5              MS. PUCKETT: I really think that, I'm

6    sorry.   I'm objecting to that question based on

7    this is testimony about a document which the

8    Hearing Officer has indicated that will not come in

9    and I don't think it's proper for her to testify as

10   to that document.

11             MR. TIERKA: The Hearing Officer ruled

12   fifteen minutes ago that in an extremely similar

13   case regarding the IEP, that the witness could

14   testify as to their independent recollection.

15             MS. PUCKETT: I don't think it was about

16   her-

17             MR. TIERKA: I'm reading off the document.

18             MS. PUCKETT: I don't think it was that he

19   ruled-his ruling was similar, it was based on where

20   she was getting her opinion of the Student's

21   progress from and it's part of her-

22             HEARING OFFICER DuBOW: All right, I

wtk                                                              56

1    understand.  Ms. Houck, you're testifying you never

2    got it, is that your testimony?

3              THE WITNESS: That's my testimony.

4              HEARING OFFICER DuBOW: All right, what

5    more do you want?

6              MR. TIERKA: I'd like to ask her if she

7    made an independent check of her machine to see if

8    she got it.  And she's not reading off the

9    document, she's going from her recollection of that

10   chapter.  I appreciate the objection, I make the

11   same argument all the time, but I do think-

12             THE WITNESS: I have a computer repairman

13   coming, I just would like to let them in and then

14   move to another room, please?  Okay?  Just a

15   moment.  Give me just 15 seconds.

16             MR. TIERKA: As I said, I make that

17   objection all the time and I appreciate the

18   objection.  But I do think that similar testimony

19   has just been allowed just now and I've also done

20   everything I can to allow us to work off the

21   document-but-

22             HEARING OFFICER DuBOW: No, but the

1    previous issue was she was giving an overall view

2    as

3          [Simultaneous conversation.]

4          HEARING OFFICER DuBOW: But anyway, I-I'm

5    not going to allow her to talk about the particular

6    document, itself, but she can talk about.  She said

7    she checked her fax thing, I assume and that it

8    wasn't there for this document.

9          BY MR. TIERKA:

10   Q    Did you check your fax machine's record of

11   faxes coming in?

12   A    Yes.

13   Q    And was there any record-of the fax coming

14   in from Malcolm X's number.

15   A    Between June 9 and June 15, those are the

16   records I checked.

17         MR. TIERKA: I have no further questions of

18   this witness.

19         HEARING OFFICER DuBOW: Cross?

20                CROSS EXAMINATION

21         BY MS. PUCKETT:

22   Q    This is Tiffany Puckett, Ms. Houck, how

58

1   are you?

2       A   Hello, fine, thank you.

3       Q   You indicated that you did not receive a

4   meeting invitation, correct?

5       A   That's correct.

6       Q   How did you find out about the meeting

7   that was scheduled for the Student on June 20?

8           MR. TIERKA: If I could just add a word?

9           HEARING OFFICER DuBOW: She's asking a

10  legitimate question.

11          MR. TIERKA: I'm not objecting to the

12  question.  I just want to add an alert to Ms.

13  Houck-

14          MS. PUCKETT: No, I'm-

15          HEARING OFFICER DuBOW: That's not proper.

16          MS. PUCKETT: They're inappropriate.

17          HEARING OFFICER DuBOW: She asked a

18  question.  If you have an objection, you can ask in

19  an objection.

20          MR. TIERKA: I'll make the objection.  I'll

21  object to the question to the degree that it calls

22  upon attorney/client privilege.

wtk

1        HEARING OFFICER DuBOW: Overruled.  Go

2   ahead.

3        BY MS. PUCKETT:

4   Q    Yes, Ms. Houck, how did you know about the

5   June 20 meeting at 9:30 at Malcolm X for this

6   Student?

7   A    I'm sorry, how did I know about a meeting

8   on June 20?

9   Q    Yes.

10  A    I don't know that there was a meeting on

11  June 20.

12  Q    Okay.  Did anyone from your office call

13  Malcolm X on June 20, at 9:30 and indicate to the

14  grandparent not to participate in the June 20

15  meeting?

16  A    I don't recall.  I don't recall what

17  happened on June 20.

18  Q    Do you recall calling Malcolm X and

19  speaking with Ms. Peak and indicating for her not

20  to participate in a meeting?

21       MR. TIERKA: Objection, same privilege.

22       HEARING OFFICER DuBOW: Overruled, you

wtk                                                              60

1    called this witness, I told you she was going to

2    sacrifice that, whatever that is go ahead.

3

4           BY MS. PUCKETT:

5    Q    I'm waiting for her answer.  Did you,

6    yourself, talk to Ms. Peak on June 20 at Malcolm X

7    School and tell her not to participate in a meeting

8    for this Student?

9           HEARING OFFICER DuBOW: Are you there?

10          MS. PUCKETT: No, she hung up.

11          HEARING OFFICER DuBOW: Where is she?

12          MR. TIERKA:   She--[Unintell.]

13          [Pause.]

14          BY MS. PUCKETT:

15   Q    Ms. Houck?

16   A    Yes?

17   Q    I indicated to you--do you--did you

18   contact Ms. Peak over at Malcolm X School on June

19   20, at 9:30 and indicate to here that she should

20   not participate in a meeting with the school.

21   A    I don't recall.  June 20, I don't-

22   Q    Do you recall contacting Malcolm X School