wtk

1  on any date telling Ms. Peak not to participate in

2  a meeting?

3      A    For M       Pe

4      Q    For M       P

5      A    I don't know, I don't recall.

6      Q    Is that-if there was a-if someone was

7  contacting Malcolm X School, who would that person

8  be, would it be you?

9      A    No, I'm sorry.

10     Q    If there was any contact with Malcolm X

11 School, who would do the contacting?

12     A    Um-

13     Q    I'm sorry, I couldn't hear you?

14     A    I would do the contacting regarding

15 something like that?

16     Q    You said you would?

17     A    Yes.

18     Q    Have you contacted Malcolm X School in

19 regards to scheduling a meeting for this Student?

20     A    Mi      Pe      No, I don't think, no.

21          MS. PUCKETT: I have no additional

22 questions.

wtk

1        THE WITNESS: No, I didn't contact them

2   because I didn't receive a meeting invitation.

3        MS. PUCKETT: I have no additional

4   questions.

5        HEARING OFFICER DuBOW: Your testimony, you

6   didn't contact Malcolm X-

7        THE WITNESS: I don|t recall contacting

8   Malcolm X about M'    __ P   and I did not respond

9   to a meeting invitation-there's no meeting

10  invitation in my file.  No, I couldn't have

11  responded to a meeting invitation.

12       HEARING OFFICER DuBOW: Did you try to

13  contact Malcolm X about setting up a any kind of

14  meeting about M)    ___ P

15       THE WITNESS: No.

16    ,   HEARING OFFICER DuBOW:  -before you filed

17  the Hearing Request?  The answer is no?

18       THE WITNESS: The answer is, no.

19       HEARING OFFICER DuBOW: Okay.

20       HEARING OFFICER DuBOW: Anything further?

21       MR. TIERKA: I have no further questions.

22       HEARING OFFICER DuBOW: Thank you.

wtk                                                              63

1           MR. TIERKA: Carolyn, hang up, bye.

2           MS. PUCKETT: She's gone, the little green

3    light's off.

4

5                      ALICE M. PEAK

6    was called as a witness and, having been first duly

7    sworn by the Hearing Officer was examined and

8    testified as follows:

9           HEARING OFFICER DuBOW: Please state your

10   name for the record.

11          THE WITNESS: My name is Alice M. Peak.

12          HEARING OFFICER DuBOW: And your

13   relationship to the Student?

14          THE WITNESS: Grandmother of M████ P███.

15          HEARING OFFICER DuBOW: Your witness.

16                   DIRECT EXAMINATION

17          BY MR. TIERKA

18      Q   Ms. Peak, is Mi____ having behavior

19   problems at school?

20      A   Yes, he is.

21      Q   When did you first become aware of these?

22      A   Um--

wtk                                                                64

1        Q     Approximately?

2        A     --probably about two years ago.

3        Q     Has the school ever called you because of

4    M          ; behavior?

5        A     Yes.

6        Q     This last second half of the last school

7    year, about how often were you being called on        .

8    M_          ; behavior?

9        A     I was called about three or four times.

10   After I got the calls, I started going over there

11   walking the halls.  And the teachers–his teachers

12   would come out and they would talk to me and say,

13   he throw his book bag in class–

14            HEARING OFFICER DuBOW: I don't understand

15   a word you're saying. You're going to have to slow

16   down.

17            MR. TIERKA: Okay.  You're going to have to

18   slow down a little bit.

19            BY MR. TIERKA:

20       Q     Let's start with the first question: So,

21   I'm sorry, you said three or four times over the

22   second half of the last school year?

wtk

1    A    Yes.

2    Q    They called you?

3    A    Yes.

4    Q    And I asked you whether the school had

5    contacted you.  Who at the school contacted you?

6    A    Mrs. Jones.

7    Q    And who is she?

8    A    She's some kind of counselor over there.

9    Q    Okay.

10    A    I was asked to come over to the school and

11    I went to the office and I talked to Mr. Kimbell

12    [ph] and Mr. Owens [ph] about M.

13    Q    Mr. Kimbell?

14    A    Mr. Kimbell, he's the principal and Mr.

15    Owens's the assistant principal.  And Mr. Owens was

16    saying, I'm having a lot of problems about M.

17    And he said I don't want to [Unintell.] and I said,

18    okay, I'm going to come over here and I'm going to

19    walk the halls and catch him.  So, I goes and walks

20    the halls.  He's in the halls running up and down

21    on every floor, from the first floor to the third

22    floor-fourth floor.  And his teacher told me that

wtk

1  M:    . is running around the halls.  When he comes

2  in in the morning, he throws his book bag in he

3  classroom and she don't see him no more.  So, I

4  catch him in the hall, he walked the hall all the

5  time.

6          So, after that, I took him out in the

7  hallway and I kinda punched him a little bit and

8  then I took him back in the classroom.  Then after

9  that, they called me again and I caught him in

10  there swinging on the posts in the classroom.  And

11  I sit in the classroom for about a minute.  And

12  then I left out.  Soon as I got back across the

13  street, they called me again.  They walked him

14  across the street and told me he was suspended for

15  one day.

16     Q    Now when was this?

17     A    That was back in-before school was let

18  out.

19     Q    Okay.

20     A    I got another phone call.  I was in the

21  community center, where I volunteer at.  And I

22  looked come across the street over there, told me

wtk

67

1  to come and get-Ms. Jones told me to come and get

2  M         .  As I was coming across, they had dragged

3  him out the school, on the playground.  And I asked

4  her why did they drag him?  Because his clothes was

5  all dirty.  So, she said, he's running the halls,

6  he's not going to none of his classrooms and this

7  is every day.  She said, Ms. Peak, he's going to be

8  suspended for one day.

9      Q    And who was this?

10     A    This was Ms. Jones.

11     Q    Ms. Jones, again?  Okay.  How many

12  times-how often did you go visit the school over

13  the second half of last school year?

14     A    I goes through there all the time, because

15  I live right across the street.

16     Q    All the time-give me some idea how many

17  times per week?

18     A    Well, I go in there maybe every other day,

19  I goes through there.

20     Q    Of those times that you went and visited,

21  how often was M:        running the halls, as you

22  said?

1        A    He runs the halls all the time.

2        Q    So, every time you visited?

3        A    Yes, he'd be in the halls.

4        Q    Now, you went to-well, let me ask you

5    this.  Was that occurring before the January '05

6    IEP meeting?

7        A    That was after the IEP meeting.

8        Q    Okay.  And when you spoke to his teacher

9    about his running in the halls, did she indicate

10   that it was a daily thing or did you talk about how

11   often it was?

12       A    His home room teacher, that's-he never

13   goes to her classroom and he be's with this-she's

14   not a teacher, she's a what they call it-she helps

15   out in the classroom with the teachers.

16       Q    An aide?

17       A    Yeah, she's a aide and every time I sees

18   her, she's got Mi        by the hand.  And I said,

19   why he's with you?  She said because he don't want

20   to go to his classroom.  So, he sits there with

21   her, all day.

22       Q    He sits with her.

wtk

1      A    She gets him out the hall and he sits with

2  her.

3           HEARING OFFICER DuBOW: Who?

4           THE WITNESS: M▌▌▌▌▌.  He sits with the

5  aide.

6           HEARING OFFICER DuBOW: He sits with the

7  AIDE?

8           THE WITNESS:  Yes, her name is Ms. Palmer

9  [ph], he be with Ms. Palmer all day.

10          BY MR. TIERKA:

11     Q    Out in the hall you said, or-

12     A    Out in the hall, he don't come home with

13  homework and he don't read that well.  And it's a

14  lot of things.  M▌    -M▌        I don't know, when

15  their mother died-they were doing pretty good

16  before their mamma died, and after that, two years

17  ago, then things start going downhill with him.  He

18  just started acting out.  So, when I was talking to

19  one of the teachers about, maybe he need a change,

20  you know.  He need to be-so this is why he was

21  telling me about the special-ed--put him in, the

22  IEP was going to put in special-ed.  So they put

1    him in special-ed, and after that, they said he was

2    doing fine.  And I said, well, he's not doing fine

3    at home because I don't never see no homework.  And

4    on his report cards it always say-when they come,

5    you say he's doing fine, but they put stuff on the

6    report card what he done did all through the year.

7    And I-

8        Q    You say they put something on the report

9    card?

10       A    Yeah, they writes on the report card what

11   he's doing-M      s not doing this; M      s not

12   doing that.  And I said, well y'all set up that IEP

13   say he's doing good.  It's on that-it's written in

14   his report card what he do all through the school

15   days.

16            MR. TIERKA:  I have no further questions.

17            HEARING OFFICER DuBOW:  Cross

18                  CROSS EXAMINATION

19            BY MS. PUCKETT:

20       Q    Hi, Ms. Peak.  You indicated that his

21   behavior is a concern at this point, correct?

22       A    Yeah.

1       Q    Have you ever expressed that to the

2   teacher that he needs, maybe something different in

3   his IEP?

4       A    When we go to the IEP, when it comes to

5   Ms. Gregory, and his teachers be in the meeting

6   also and we was talking about special-ed and they

7   were saying he was doing good and I was asking one

8   of the teachers why he walked the halls.  And so

9   that's what they were-talking about the special-ed

10  and they going to have a tutoring for reading.

11      Q    were you at-you were at the January 25

12  meeting, correct

13      A    Yes, I was there.

14      Q    You were at the January 20 meeting,

15  January 2 meeting, I'm referring to what's listed

16  as Parent's document, let me get the exact number,

17  it's the MDT notes, in the back of the IEP, it's

18  document No. 8, and in that document, it indicates

19  that Parent reports overall improvement in

20  M   .     school performance, though she reports

21  concerns about M      not bringing home homework.

22  What improvements were you referring to in regards

wtk                                                                        72

1    to his school performance?

2           MR. TIERKA: I'm going to object on

3    foundation, if counsel want's to ask, Ms. Peak,

4    first whether or not she actually said that, then I

5    wouldn't have an objection.

6           MS. PUCKETT: I can change my line of

7    questioning.

8           HEARING OFFICER DuBOW: Which, can you

9    refer me to the-

10          MS. PUCKETT: I'm referring to Parent's

11   Document No. 8, it's the DCPS IEP.  In the back of

12   the IEP, is the meeting notes.

13          HEARING OFFICER DuBOW: Which page number?

14          MS. PUCKETT: I'm referring to Page-I

15   believe it's Page 2 of the meeting notes, Parents

16   Document No. 8.

17          HEARING OFFICER DuBOW: Page 2 of the

18   meeting notes?

19          MS. PUCKETT: Yes.

20          HEARING OFFICER DuBOW: Here-okay, at the

21   top?

22          BY MS. PUCKETT:

wtk                                                                      73

1        Q    Yes.   On this document, it indicates the

2    Parent reports overall improvement in M.

3    school performance, though she reports concerns

4    about M.        not bringing home homework.   Is that

5    what you-is that what your response at the meeting

6    was in regards to M.      ?

7        A    Yes, [Unintell.]

8             HEARING OFFICER DuBOW: I'm sorry, you're

9    going to have to slow down a little on your

10   response so the recorder can pick it up.   What-will

11   you, please, she asked you, the MDT report says

12   overall improvement in Mi       ; school

13   performance, though she reports concerns about

14   M:       not bringing homework home.   Is that

15   correct?

16            The WITNESS: Yeah.

17            HEARING OFFICER DUBOW: So, what's in that

18   report in that note is correct, is that your

19   testimony?

20            THE WITNESS: But other things that-

21            HEARING OFFICER DUBOW: I'm sorry, I can't-

22            THE WITNESS: There were other things that

1    I said about homework.

2           HEARING OFFICER DUBOW: I understand.  She

3    just asked you that question.  I'm just trying to

4    make sure I understand your answer.  Is what was in

5    the MDT notes, is that accurate?

6           MR. TIERKA: Show her.

7           MS. PUCKETT: Yeah, she can-

8           MR. TIERKA: It says parent reports because

9    that's being recorded, overall improvement in

10   M        _ overall performance.  They're asking if

11   you reported that.  And concerns about M      ι not

12   bringing work home.  So, is all this correct?  Did

13   you report an overall improvement in M▇▇▇▇▇▇▇

14   school performance?

15          THE WITNESS: Yeah

16          HEARING OFFICER DuBOW: Is that, I can't

17   hear your, is that what-the answer is, yes?

18          THE WITNESS: Yes.HEARING OFFICER DuBOW:

19   All right.

20          MR. TIERKA: And you were reporting

21   concerns about M    ... not bringing home work?

22          THE WITNESS: Yeah.

wtk

BY MS. PUCKETT:

1

2      Q     Thank you, what overall improvements were

3   you referring to at that meeting?

4      A     Well, when I was talking about the

5   homework and everything, M       was not

6   [Unintell.] after we had the IEP, we was talking

7   about the homework, and then I started going

8   upstairs and meet with the teachers and that's when

9   she got explaining to me about M        ; going in

10  her classroom and he was running the halls.

11     Q     'I'm sorry, let me just take you back to

12  the meeting.  You indicated that there was an

13  overall improvement in his school performance.

14  What improvement were you referring to when you

15  said that?

16     A     I think-

17     Q     There was an overall improvement in his

18  school performance-in M         school performance.

19  How was the student improved up to that date?

20     A     What do you mean?

21     Q     How has his performance at school

22  improved?  Do you believe his performance improved?

wtk

1    A    Uh-uh.

2    Q    Okay, but you indicated-

3         HEARING OFFICER DuBOW: Was that a yes or a

4    no?

5         THE WITNESS: That, no.

6         BY MS. PUCKETT:

7    Q    So, that statement is incorrect.

8    A    Before the IEP or after the IEP?

9    Q    I'm talking about before the IEP, this IEP

10   meeting was January 25, so at that meeting, you

11   indicated that there was an overall improvement in

12   his school performance.

13   A    During that time the IEP?

14   Q    Yes, what improvement were you referring

15   to?

16   A    Well, he was bringing homework home at the

17   time.

18   Q    Mm-hmm.

19   A    And he was doing his homework and he was

20   doing great.

21   Q    He was doing good in regards to what,

22   grades?  Okay.  You indicated that you had talked

1   with the teachers regarding concerns about his

2   placement.  Did you talk to Ms. Gregory about his

3   placement?

4       A   When I went on that-when we had that

5   meeting, I went to the meeting, I kept my

6   appointment.  This was before, after I had gotten

7   Carolyn Houck and I had gotten a lawyer.  Okay, I

8   didn't go to the school and tell them that I had a

9   lawyer, [Unintell.]  So, I went to the meeting, I

10  kept my appointment, I went over there.  But I

11  thought they had [Unintell.] and when I called, I

12  told her I had a lawyer.  And I went over there and

13  I went into a room everybody was sitting at the

14  table and I said my lawyer going to be here and

15  they said, your lawyer?  I said, yes, Ms. Carolyn

16  Houck.  So, they said they'd wait till Ms. Gregory

17  come back in.  So she came back in I said, Ms.

18  Gregory, I said  did you-[Unintell.] my lawyer,

19  Carolyn Houck.  She said, Ms. Peak, I didn't know

20  you had a lawyer.  So, I said, yes, I do-so I got

21  on my cell phone.

22      Q   Which meeting are you referring to?

1        A    The one on the 20, I think it was.

2        Q    June 20?

3        A    Yeah.

4        Q    Okay.

5        A    I got on my cell phone, I called Ms. Houck

6   and I'm here, and I told her-

7             MR. TIERKA: I'd like to caution the

8   witness about attorney/client privilege, if I may.

9             HEARING OFFICER DuBOW: I-

10            Mr. TIERKA: About discussing the contents

11  of her communications with her attorney-make sure

12  she understands that that;s privileged-

13            BY MS. PUCKETT:

14       Q    And I-I'm confused at this point because

15  I'm trying to-is she referring to the June-you're

16  referring to the June 20 meeting, correct?

17       A    June, yeah, we supposed to have it, the

18  day I went to and the lawyer, she didn't know

19  anything about it, I was the one that called her.

20       Q    Let her know that I was in a meeting and

21  she told me I wasn't supposed-

22            MR. TIERKA: Wait, wait, wait, wait.

wtk

1          HEARING OFFICER DuBOW: All right, that's

2    in.  I already heard this.

3          MS. PUCKETT: And I think the thing-

4          HEARING OFFICER DuBOW: I don't know-

5          MS. PUCKETT: I mean, Parent's counsel

6    opened up the door for attorney/client privilege by

7    calling-because it's all relevant, it all goes to

8    the issue.

9          MR. TIERKA: Hold on, this is a very issue,

10   to say that I opened the door to a full release of

11   attorney/client privilege, simply by calling Ms.

12   Houck is ridiculous.  In calling Ms. Houck-

13         MS. PUCKETT: I didn't say full release-

14         HEARING OFFICER DuBOW: I don't-

15         MS. PUCKETT: I did not say full release.

16         HEARING OFFICER DuBOW: First of all, she

17   started off talking about the January meeting, all

18   right?

19         MS. PUCKETT: Yes.

20         HEARING OFFICER DuBOW: Now, all of a

21   sudden, we're in the June meeting, so maybe let's

22   go back, take it a little slower here and as we

1   were just discussing the January meeting, then all

2   of a sudden we're into the June meeting.

3           So, maybe we can do some kind of-go back

4   and a little slower try to make the transition to

5   what had transpired from the January meeting to the

6   when we get up to the June 20, and then if Mr.

7   Tierka has some objections at that time, we can

8   address it.  But, as we're jumping around here, I

9   think it's confusing everybody.  So, let's start,

10  okay, we were on the January meeting.  And we

11  covered those notes.  Now, proceed.

12          BY MS. PUCKETT:

13      Q    After the January meeting, did you talk to

14  Ms. Gregory about placements for the children?

15      A    In January?  No.

16      Q    After January, after the January meeting?

17      A    No, I didn't.

18      Q    When did Ms. Gregory contact you in

19  regards to a meeting for this Student in regards to

20  that June 20 meeting, when did she contact you?

21      A    I saw Ms. Gregory in the parking lot.

22      Q    Okay, and what was the discussion in the

wtk                                                                          81

1    parking lot?

2        A    She gave me a date for the IEP meeting.

3        Q    How did she come to discuss a meeting with

4    you at that point?  She saw you, was there a

5    discussion?

6        A    When I was inside the school and she said,

7    Ms. Peak, I want to see you and she said I want to

8    set up a date for our IEP meting.

9        Q    Did she tell you why she wanted to see

10   you?

11       A    No.

12       Q    Did she tell you why she wanted to set up

13   a meeting?

14       A    No, she said it's about Mj

15       Q    Did she tell you that she had received

16   something from your attorney?

17       A    Uh-uh.

18            HEARING OFFICER DuBOW: I don't know, is

19   that a yes or a no?

20            THE WITNESS: Oh, no.

21            BY MS. PUCKETT:

22       Q    You indicated that she just gave you a

82

wtk

1    date?

2        A    She gave me a date.  She came-matter of

3    fact she came across the street where I was

4    standing in my yard.

5        Q    And that date was what date ?

6        A    She gave me I think it was June 20 at 9;00

7    o'clock?

8        Q    Okay, and at that point, you had an

9    attorney, correct?

10       A    Yes,

11       Q    Did you tell your attorney about that

12   date?

13           MR. TIERKA: Objection, attorney/client

14   privilege.

15           HEARING OFFICER DuBOW: I'll allow it, go

16   ahead.

17           BY MS. PUCKETT:

18       Q    Did you tell your attorney about that

19   date?

20           HEARING OFFICER DuBOW: We're not asking

21   about the substance of the conversation, are we, so

22   at this time, you're just asking relating to

wtk                                                                83

1    whether there was a date or not.

2            BY MS. PUCKETT:

3        Q    Without telling me the substance of the

4    conversations with your attorney, did you tell your

5    attorney about the date, the June 20, date?

6        A    Um--

7            HEARING OFFICER DuBOW: You have to say yes

8    or now.

9            THE WITNESS: Oh, no.

10            BY MS. PUCKETT:

11        Q    Did you go to that meeting?

12        A    Yes, I Did.

13        Q    Did you participate in that meeting?

14        A    No, I didn't.

15        Q    Why didn't you participate in the meeting?

16        A    The reason I didn't participate was

17    because I got [Unintell.] that day.

18        Q    Okay.

19        A    I called my attorney and I just walked

20    out, that's all.

21        Q    Did our attorney call the school on Ms.

22    Gregory's phone?

1          MR. TIERKA: On that date?

2          BY MS. PUCKETT:

3     Q    On June 20, yes?

4     A    Ms. Gregory stopped me at the elevator and

5    I told her I didn't want to attend the meeting.

6    She asked me why, I said, you have to call my

7    lawyer.  And during that time, I think we was

8    standing in the hallway, she called [Unintell.] and

9    they talked.

10    Q    So, the attorney called Ms. Gregory's

11   office?

12    A    No, Ms. Gregory called, I gave her the

13   cell phone number, right there at the elevator.

14   And she called her while I was standing there.

15    Q    And the meeting didn't go forward on that

16   day, correct?

17    A    Nuh-uh.

18          HEARING OFFICER DuBOW: Is that a yes or a

19   no?

20          THE WITNESS: No.

21          BY MS. PUCKETT:

22    Q    What about the placement at Malcolm X, do

1  you believe is inappropriate for the Student?

2      A    Well, I have four kids that was going to

3  Malcolm X.  And the first child was two-I got two

4  children with special needs, kids that went to

5  Malcolm X.  And these two children cannot read and

6  both one of these kids is in the fifth grade-

7          HEARING OFFICER DuBOW: All right, I-we're

8  only talking about M

9          MS. PUCKETT: Yeah, M

10          THE WITNESS: [Unintell.] Malcolm X is not

11 a place for little children.

12          BY MS. PUCKETT:

13      Q    What is going on with M         right now

14 that-what's going on with M          placement right

15 now, regardless of what happened with other people

16 that indicates that it's not appropriate for him?

17      A    Right now, I think M        needs a change

18 out of Malcolm X.  Malcolm X is not a school for

19 M

20      Q    Why is it not a school for him?

21      A    Because the way they let children walk the

22 halls.  I have been in that school and I

1  participate in that school. And the things that

2  goes on now in there, they let the children walk

3  the halls. Half the kids in Malcolm X can't read.

4     Q  Has M.    made progress since he's been

5  in special-ed? He's only been in for a year,

6  correct?

7     A    Yeah.

8     Q    Has he made progress?

9     A not that much because he's been walking the

10  halls.

11     Q    But has his grades been better?

12     A    No.

13     Q    Have you, since that day, contacted the

14  school in regards to a new meeting, since the June

15  20 date?

16     A    [Unintell.]

17         HEARING OFFICER DuBOW: I can't hear you.

18  Since the June 20, you didn't talk to anyone at the

19  school?

20         THE WITNESS: After that, I ain't scheduled

21  nothing, uh-uh.

22         MS. PUCKETT: I have no additional

wtk

1  questions.

2       HEARING OFFICER DuBOW: Any redirect?

3            REDIRECT EXAMINATION

4       BY MR. TIERKA:

5       Q    Yes, Ms. Peak, when you were talking about

6  the June 20 meeting, you started talking about what

7  had happened when you first came in, when you first

8  went into the meeting. [MOVES MICROPHONE.] when you

9  went to the June 20 meeting that you were

10  testifying about before, did you-you didn't see Ms.

11  Houck there, correct?

12      A    Ms. Houck had left--no, Ms. Houck wasn't

13  there.

14      Q    And did you mention the fact that she

15  wasn't there to Ms. Gregory?

16      A    When I went into the room, there were

17  three ladies sitting at the table and I asked where

18  Ms. Gregory was and Ms. Gregory had stepped out the

19  room.  I left out, when Ms. Gregory came back in, I

20  asked her, I said my lawyer's going to be here.

21  And she said, what lawyer?  I said I have a lawyer

22  because I want to, you know, I talk a lot about

88

1    placing my children in a private school and stuff,

2    you know, from Malcolm X. And she said, no, I

3    hadn't talked to your lawyer. So, I said, well,

4    I'm not going to attend this meeting, Ms. Gregory,

5    I said, until you talk to my lawyer.

6         So, I gave her the lawyer's number. And

7    she called the lawyer right there at the elevator.

8    So, I don't know what there was saying, because I

9    had went over to the other side.

10    Q    And when you had that conversation in the

11    parking lot, when she told you about the date for

12    the meeting-the earlier conversation in the parking

13    lot when she told you about the June 20 meeting?

14    Did you talk about you having a lawyer then?

15    A    No, only think I told her that I want my

16    children to be placed in a private school and I'm

17    going to get a lawyer. At the time, during that

18    time. And that's when-

19         HEARING OFFICER DuBOW: Wait a minute, when

20    was this parking lot discussion?

21         THE WITNESS:  Well, I was inside the

22         school at first.

168

wtk                                                                    89

1              HEARING OFFICER DuBOW: No, when was it?

2     Was it in April, May, June, when was it?

3              THE WITNESS: It was in June.

4              HEARING OFFICER DuBOW: First part of June?

5              THE WITNESS: Yeah, it was in June.    Mr.

6     Tierka, sorry.

7              MR. TIERKA: I have nothing further.

8              HEARING OFFICER DuBOW: Thank you very

9     much.  Oh, do you have any, yes, go ahead.

10                    RECROSS EXAMINATION

11             BY MS. PUCKETT:

12        Q    You just indicated that when you got to

13    the meeting, you asked Ms. Gregory where's your

14    lawyer, correct?

15        A    Mm-hmm.

16        Q    Why did you assume that your lawyer would

17    be there?

18        A    Because when I talked to her in the

19    parking lot, and when I told her I wanted to change

20    from-I knew that we was going through the school

21    thing, I knew that I had to have an appointment

22    with Ms. Houck now, to talk to them about my

1   children, and i took all the papers and court costs

2   and everything.  So, I didn't, my lawyers always

3   tell me if I don't understand something don't

4   repeat, so I was telling her how I wanted to

5   change, I'm going to get my children in private

6   schools because Malcolm X was not a school for them

7   anymore, because I was explaining to her how she

8   stuck Rochelle [ph] into this school.  They moved

9   her out of the school and put her in another school

10  and the school was the same as Malcolm X, now

11  they're trying to throw her out.

12        So, I said I want my children, I said–she

13  said, Ms. Peak, now–I said you told me, you gave me

14  your work you put that special-needs child in this

15  school, this school was picked for her and it's

16  not.  And I said, how you're doing the same thing

17  to this other kid.

18        Q    Did you, I mean, what I'm saying is, you

19  indicated to Ms. Gregory, is your lawyer going to

20  be there?

21        A    Mm-hmm, that's what I said.

22        Q    Why did you assume that your lawyer was

wtk

1  going to be there?

2      A    I don't know, I thought maybe that she-you

3  know, would contact her because I called Carolyn

4  and let Carolyn have a let Carolyn know I had a

5  meeting.

6      Q    On which day?

7      A    On the same day, same day on the 20, June

8  20, that morning.

9      Q    I'm talking about Ms. Gregory, when you

10  asked her was your lawyer going to be there, why

11  would Ms. Gregory know that your lawyer's going to

12  be there?

13     A    Because when she came upstairs, I told her

14  to call my lawyer and she said I couldn't-see they

15  had had some words on the phone, I don't know

16  because she said she didn't like how the lawyer was

17  talking to her.  And I said well, what words does

18  she have that she's coming, I said, because I'm

19  not-I'm going to walk out if she's not coming.  She

20  said well, I'll get back with you and she's never

21  gotten back with me.

22     Q    Did you, prior to this meeting indicate

wtk

1   that you had a meeting with Ms. Houck and that's

2   who your attorney was going to be?

3       A   [Unintell.]

4       Q   Did you, prior to the meeting indicate

5   that you had a meeting with Ms. Houck and that your

6   attorney would be Ms. Houck?

7           HEARING OFFICER DuBOW: I don't understand

8   the question.

9           Ms. PUCKETT: I'm sorry.

10          HEARING OFFICER DuBOW: Rephrase your

11  question.

12          BY MS. PUCKETT:

13      Q   Before you attended the meeting-

14          HEARING OFFICER DuBOW:-prior to June 20.

15          BY MS. PUCKETT:

16      Q   Before the June 20 meeting-I better start

17  saying which meeting I'm referring to.  Before the

18  June 20 meeting, did you talk to Ms. Gregory and

19  indicate who your attorney was going to be at the

20  meeting?

21      A   No.

22          MS. PUCKETT: I have no further-

1            THE WITNESS: Actually, I forgot.  I forgot

2     about the meeting.

3            HEARING OFFICER DuBOW: I don't understand,

4     you forgot.  What do you mean you forgot?

5            THE WITNESS: When I had gotten-when I

6     talked to Ms. Houck , I had forgotten to call again

7     and see that they get a letter, so I thought that

8     they had gotten a letter.

9            HEARING OFFICER DuBOW: You got a letter?

10           THE WITNESS: No, I didn't get no letter.

11           HEARING OFFICER DuBOW: You didn't get a

12    letter-of-invitation?

13           THE WITNESS:  No, she came across the

14    street and gave me the date, told me what time it

15    would be.

16           HEARING OFFICER DuBOW: She didn't give you

17    any letter?

18           THE WITNESS: Uh-uh, no, sir.

19           HEARING OFFICER DuBOW: You live right

20    across the street from the school?

21           THE WITNESS: I live right across, anything

22    they got, for IEPs, they bring IEPs to my house to

1   sign, whatever.

2          MS. PUCKETT: I have no additional

3   questions.

4          HEARING OFFICER DuBOW: Is that it, Mr.

5   Tierka?

6          MR. TIERKA: It is, thank you.

7          HEARING OFFICER DuBOW: Thank you, that's

8   all.

9          Mr. TIERKA: I call Karen Clownam [ph] from

10  Rock Creek.

11         HEARING OFFICER DuBOW: Five minute recess.

12         [Recess.]

13         HEARING OFFICER DuBOW: We're on the

14  record.

15         Whereupon,

16                  KAREN CLOWNAM

17  was called as a witness and, having been first duly

18  sworn by the Hearing Officer was examined and

19  testified as follows:

20         HEARING OFFICER DuBOW: Please state your

21  full name for the record.

22         THE WITNESS: My name is Karen CLOWNAM.

wtk                                                                                  95

1          HEARING OFFICER DuBOW: And your position?

2          THE WITNESS: I'm the executive director of

3     student services at Rock Creek Academy.

4          HEARING OFFICER DuBOW: Okay, Mr. Tierka

5     will ask you about M

6                    DIRECT EXAMINATION

7          BY MR. TIERKA:

8     Q    Hi, Ms. Clownam.  Is it part of your

9     duties there at Rock Creek, to be familiar with the

10    services offered there?

11    A    Yes, it is.

12    Q    Is it part of your duties to participate

13    in admissions decisions for children?

14    A    Yes, it is.

15    Q    Has Rock Creek accepted M        for

16    admission?

17    A    Yes, we reviewed his packet and conducted

18    a tour and interview with the Parent.

19    Q    I know you have M            IEP from January

20    '05 there.

21    A    That's correct.

22    Q    I know it identifies him as LD, but have

wtk

1  you also, well, do you understand him to have

2  behavioral issues, as well?

3      A    I reviewed a psycho-educational evaluation

4  from July 2004; I've also reviewed a

5  speech-and-language evaluation and a social history

6  evaluation from July 2004; and a-

7          HEARING OFFICER DuBOW: Speak up, please.

8          THE WITNESS:   --about--

9          HEARING OFFICER DuBOW: You're going to

10  have to speak up.  You're going to have to repeat

11  that, we cannot record you, you're too soft.

12          THE WITNESS: Okay.

13          HEARING OFFICER DuBOW: Repeat what you

14  just said.

15          THE WITNESS: I said that I have reviewed a

16  psycho-educational evaluation, dated July 2004; a

17  speech-and-and language evaluation and social

18  history evaluation, also dated from July 2004.  And

19  I've spoken to the Parent regarding his behavioral

20  concerns.

21          BY MR. TIERKA:

22      Q    So, what is your understanding-I mean, I

1    understand that the IEP says one thing, but what is

2    your understanding of Mj ____ _ needs right now?

3         A    In terms of behavior or in terms of

4    overall?

5         Q    Overall.

6         A    Okay.  I've been reviewing the documents,

7    I've noted that the psycho-educational evaluation

8    recommended an O.T. eval.  I didn't see an

9    occupational therapy on file, so I'm not certain if

10   that's a service he will or will not need.  The

11   social history that I reviewed recommended

12   psychological counseling.  I don't see that as

13   evident on his current IEP.  So, it appears that

14   will be a service that he needs.  There was also a

15   discussion with the Parent of concerns about his

16   safety in staying on location, and [Unintell.]

17   behaviors, behavioral program and structure for him

18   to be successful.

19        Q    Does Rock Creek have a behavior

20   modification program there?

21        A    Yes we do.

22        Q    Could you tell me something about it?

1      A    Sure, we have a point-sheet system, a

2  level system, where everything is positive

3  re-enforcement.  Our students have to ear certain

4  points throughout the day for following directions;

5  for being on location; for completing their work,

6  things of that nature.

7          At they earn points, they move up the

8  level system, so they're rewarded for positive

9  behavior.  It's very structured, it takes every

10 period of every day and it's communication and

11 feedback with the Parent daily.  So that point

12 sheet goes home, it gets signed and comes back and

13 there's a visual graphic organizer in the classroom

14 so that the student's understand how they're

15 progressing along the behavior system.  And there's

16 built-in incentives and rewards for each level of

17 points.

18     Q    Do you have a class in mind for Michael

19 right now?

20     A    Yes, it would be-as a program, when

21 students start with us, we do some testing, as

22 well, because we group our students by ability, so

wtk

1    he'll be in a separate reading group based on how

2    he tests and how he performs.  But, for the most

3    part those classes are self-contained.  Ms.

4    Hookkepple [ph] is one of the teachers is one of

5    the teachers for his age group.  He might have an

6    additional teacher for reading, because we only

7    have two teachers, but, primarily he will be in one

8    class.

9        Q    Could you tell me about Ms. Hookkepple's

10   qualifications?

11       A    Ms. Hookkepple is a licensed,

12   special-education teacher.  She's licensed in D.C.

13   for K through 12.

14       Q    How many children are in that class?

15       A    Well, the class size [Unintell.]-to-one,

16   however this coming school year we're not at

17   capacity, so there may be three or four student

18   total, depending on who shows up for start of the

19   school year.

20       Q    And are the ages of the other students

21   comparable to M████████

22       A    Yes.

1       Q    And you already said that he'd be placed

2    there based on performance level?

3       A    He would be placed in a reading group

4    based on his reading level. They do ability

5    grouping for reading.

6       Q    Rock Creek has a relationship with the

7    District of Columbia Public Schools to accept

8    students from them directly, correct?

9       A    Yes, we do.

10       Q    As a part of that relationship-so, just

11    for brevity, DCPS places children directly to Rock

12    Creek sometimes, not through a hearing process?

13       A    That's correct, through a Notice of

14    Placement; through a referral and a Notice of

15    Placement.

16       Q    And have you received placements from DCPS

17    for children similar to M.

18       A    Yes, we have.

19       Q    Based on your knowledge of Mi        and his

20    needs and your knowledge of the program there at

21    Rock Creek Academy, is there any reason why you

22    think Rock Creek cannot provide educational benefit

wtk

1    to M.        ?

2        A    No, there's not.

3             MR. TIERKA: I have no further questions.

4             HEARING OFFICER DuBOW: Cross

5                      CROSS EXAMINATION

6             BY MS. PUCKETT:

7        Q    His, Ms. Clownam, this is Tiffany Puckett,

8    how are you ?

9        A    Good, how are you?

10       Q    I'm doing fine.  You said you have

11   M:          IEP, correct?

12       A    Correct.

13       Q    And you are aware that M:       is not 100

14   percent, he's not 100 percent full-time,

15   special-ed, correct?

16       A    Based on the Jan 2005, IEP correct.

17       Q    So, Rock Creek could provide the least

18   restrictive environment for him, correct?

19       A    Well, not that--we are a full-time

20   special-education placement.  But it appears in

21   reviewing the document that it's not complete.  And

22   that M.    -- may require additional services that

wtk

1   are not a part of this IEP, based on those

2   evaluations that I spoke of earlier.  I don't see

3   any evidence in this January '05 IEP that they have

4   been considered or incorporated.

5       Q    Okay, but the January 25, IEP, does not

6   have him placed in a full-time, special-ed program,

7   correct?

8       A    That's correct.

9       Q    You indicated that in the psycho-ed that

10  he needed psychological counseling?

11      A    The social history, actually recommends

12  psychological counseling.

13          MS. PUCKETT:  One, second, I'm sorry, just

14  one second.  I have no additional questions for her

15  regarding M

16          HEARING OFFICER DuBOW: Thank you very

17  much.

18          THE WITNESS: You're welcome.

19          HEARING OFFICER DuBOW: One second.

20          THE WITNESS: Okay.

21          HEARING OFFICER DuBOW: When are you

22  available in terms of the other students?

wtk                                                                103

1              THE WITNESS: I'm sorry, could you repeat

2     the question?

3              HEARING OFFICER DuBOW: When are you

4     available to testify as to the other Peak children?

5              THE WITNESS: When am I available?

6              HEARING OFFICER DuBOW: Yeah.

7              THE WITNESS: When do you need me to be

8     available?

9              HEARING OFFICER DuBOW: Well, if you could

10    do it now, it would save everybody some time, but-

11             MR. TIERKA: I alluded to Mr. DuBOW that

12    you would like a little bit more time before the

13    other two.  Is half an hour good, is an hour good?

14    What would-

15             THE WITNESS: What time is it now, 11;30?

16    Yes, I would say, 30 minutes.

17             HEARING OFFICER DuBOW-all right we'll call

18    you back at noon.

19             THE WITNESS: And then so, the it steps for

20    Michelle and for Tatianna, correct?

21             MR. TIERKA: Correct.

22             THE WITNESS: Okay.

wtk                                                                    104

1          HEARING OFFICER DuBOW: I'd want to get, I

2     mean-

3          MR. TIERKA: That's the other attorney, so.

4          HEARING OFFICER DuBOW: Who is the other

5     attorney on this?

6          MR. TIERKA: Stephanie [ph].  She's the one

7     on the disclosures, I'm don't know if she-

8          HEARING OFFICER DuBOW: Okay, but, you

9     know, I come back at 12:00 and we'll see what we

10    can do, okay?

11         MR. TIERKA: I'll call you then, Karen.

12         THE WITNESS: Okay.

13         MR. TIERKA: Thank you.

14         THE WITNESS: Thank you.

15         HEARING OFFICER DuBOW: Nothing further,

16    closing on this case.

17         MR. TIERKA: First, I'd like to run through

18    some of the documents as they relate to many of our

19    claims.  And I'd like to deal with the evaluations

20    first, because I don't think there's any question

21    that M:      is in need of these evaluations.

22    We're requesting that they be independently funded

1   because DCPS has failed to conduct them.  And I

2   don't think DCPS has offered any argument or any

3   explanation for it's failure to do these

4   evaluations.

5           First, the occupational therapy: It's

6   called for very specifically in the

7   psycho-educational that DCPS themselves did.  And

8   that's our Disclosure No. 3, on the last page.  As

9   a matter of fact, it's the very last sentence,

10  recommends him for occupational therapy.  And that

11  was back in '04, DCPS has not conducted that

12  evaluation.

13          Similarly, in the IEP notes of August '04,

14  On the third page of the notes at the bottom of the

15  page, it recommends an O.T. evaluation and,

16  furthermore, it says, Ms. Shaw [ph], the

17  psychologist requested that when M1    _ is taken

18  for his health check-up, Ms. Peak asked for him to

19  be assessed for hyperactivity, thereby identifying

20  his need for an evaluation to get at his

21  hyperactivity.  That evaluation, typically, DCPS

22  likes to do a clinical evaluation and then send

1  that up to Dr. Taylor-Davis for a diagnosis of

2  ADHD. However, DCPS—

3          HEARING OFFICER DuBOW: What page is that?

4          MR. TIERKA: It's the third page of the

5  notes from August, '04, from that IEP. Little bit

6  past where you are now, I think. Yeah, Page 2, at

7  the bottom of the page. Reports Ms. Shaw, that's

8  the psychologist who did the psycho-ed, discussing

9  it. Also, at the top of that page, it states Ms.

10  Peak's concerns about his behavior: not turning in

11  homework; walking the halls; and says, messing with

12  other kids.

13          Furthermore, on his report card, which is

14  our Disclosure No. 7, the very last page, which has

15  teacher comments. It specifically addresses in

16  February '05 and May '05, his daily behavioral

17  problems. In one spot it says daily; another spot

18  it says often. I don't think there's any question

19  that there are behavioral issues here, which were,

20  of course, confirmed by Ms. Peak's testimony about

21  his suspensions; about being pulled from class;

22  roaming halls, and about the aide just holding his

1    hand outside in the hallway so he was never in

2    class.

3              So, I don't think there's any question

4    here that he needs a clinical evaluation to have an

5    appropriate IEP.

6              Regarding M          IEP, well, first off,

7    it's not based on full evaluations and, therefore,

8    cannot be said to be appropriate.  More

9    specifically, it doesn't deal with any of this

10   behavioral issues.  It never addresses it, simply

11   identifies him as LD; does not provide counseling,

12   as recommended in the social history, which is our

13   Disclosure No. 5.  And doesn't otherwise deal with

14   the behavioral issues raised in the report cards,

15   at the IEP meetings, and as testified by Ms. Peak.

16             The placement suffers from the same

17   problem and clearly, M       is not improving

18   according to Ms. Peak's testimony that his grades

19   have not been better; that he can't read; and he's

20   spending all his time roaming the halls.

21             There was some discussion of the-actually,

22   there was a lot of discussion about the June 20

108

1  meeting.  Obviously, there's conflicting testimony

2  from Ms. Gregory and Ms. Houck, regarding whether

3  this invitation was ever sent.  However, Ms. Peak

4  said that on 6/20, Ms. Gregory didn't even know

5  that Ms. Peak had an attorney when she arrived at

6  the meeting.  And that, Ms. Gregory, then, called

7  Ms. Houck right then on the spot.  However, we

8  don't have to necessarily resolve that conflict in

9  testimony, because Ms. Gregory acknowledged that

10  even though it's her policy to send a second

11  invitation if the first one is not is responded to,

12  she did not do so.  Even though it's policy to send

13  a meeting confirmation once a meeting has been set,

14  she did not do so.

15         She testified that the policy was to fill

16  out the form, to check all boxes for everything the

17  meeting will be dealing with and the only box

18  checked on that meeting invitation it says SEP

19  meeting, that's all it says.  It doesn't say

20  anything about placement, but Ms. Gregory admitted

21  that that was specifically the issue that had been

22  raised by Ms. Peat.

1          So, whether this invitation was sent,

2     responding to any of that is actually irrelevant

3     because the meeting was never intended to deal with

4     any of the issues that were really a subject to

5     this complaint.

6              Finally, regardless of whether that

7     meeting was scheduled or held, it does not excuse

8     DCPS for their failure to do the evals that we are

9     requesting independently now.  That had nothing to

10    do with any meeting.

11             Finally, I think Ms. Clownam's testimony

12    regarding Rock Academy and it's ability to provide

13    educational benefit to Mi      , speaks for itself.

14    Accordingly, we were asking for independent

15    evaluations of the ones listed above; interim

16    placement at Rock Creek; MDT meeting within 30 days

17    to revise the IEP and to discuss and determine

18    compensatory education.   Thank you.

19             HEARING OFFICER DuBOW: Ms. Puckett?

20             MS. PUCKETT: Yes, DCPS's position in this

21    is that placement in Rock Creek is not justified in

22    this case.   The Student was found eligible for

1    special-ed in August of '04.  So, we're here a year

2    later with a Student who is progressing.  The

3    grandmother acknowledged in a meeting in January

4    that he was progressing.

5              The special-ed coordinator testified that

6    he had made significant progress this school year.

7    She also testified that once she was aware that the

8    Parent had some concerns, she attempted to schedule

9    a meeting.  Now, there is three different versions

10   here today of, actually what happened.  Ms. Gregory

11   testified that she faxed the letter-of-invitation

12   and a letter, which is DCPS-1 and DCPS-2,

13   documentation with a fax confirmation that she knew

14   who the attorney was prior to this meeting and that

15   she knew what this proposed meeting date was going

16   to be.

17             I don't know, I mean, if the allegation is

18   that DCPS came up with a document after the fact,

19   but the document is obviously dated June 10.  It

20   was faxed to Ms. Houck's office, That letter shows

21   that Ms. Gregory knew who the attorney was prior to

22   that meeting.  We attempted to have a meeting for

wtk

1   this Student to address the concerns.  Ms. Gregory

2   testified that there was nothing that she knew of

3   that indicated that this student had behavior

4   issues to the point that he warranted a clinical

5   evaluation.

6        He's progressed this year, and we ask that

7   you find that there has been no denial of faith in

8   this situation.  The Student is progressing.  And,

9   although something might not have happened the way

10  it was supposed to happen, there is no educational

11  harm to this Student.

12       He doesn't have ESY services.  He's

13  progressing in his class work.  And I don't believe

14  at this time, a private placement is warranted.

15       HEARING OFFICER DuBOW: Thank you case is

16  submitted.  Next Case.

17       [Whereupon, the hearing was concluded.]

18                    - - -

# CERTIFICATE

I, hereby, certify that the tape recording represented by the foregoing pages was transcribed by me; and that the foregoing transcript is a correct and accurate record of the proceedings to the best of my knowledge, ability and belief.

*William T. Kennedy*

**WILLIAM T. KENNEDY**

**TRANSCRIBER**