IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————

|  |  |  |
|---|---|---|
| ALICE PEAK, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 05-1912 |
| v. | ) | JGP |
| | ) | |
| DISTRICT OF COLUMBIA | ) | |
| Defendant. | ) | |

———————————————————

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Alice Peak, by and through her undersigned counsel, hereby respectfully moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment. In support of her Motion Ms. Peak submits the attached Memorandum and states as follows:

1) Ms. Peak is no longer seeking school placement as part of this case. As the Court is aware, Ms. Peak intends to file a new complaint for placement based on facts that arose after the filing of the Complaint in this case.

2) Ms. Peak is no longer seeking evaluations, because the Defendant eventually completed the requested evaluations, several months after the filing of the administrative complaint in this case.

3) Ms. Peak remains entitled to compensatory education for the Defendant's years of violations of the Individuals with Disabilities Education Act.

4) For nearly three years, the District of Columbia Public Schools ("DCPS") failed to perform necessary evaluations of M.P. As a result, M.P. was never prescribed necessary services, and he floundered in a clearly inappropriate school placement for that time.

5) At the administrative hearing at issue in this case, the Hearing Officer ruled that
   DCPS was not in violation of the IDEA because it had attempted to schedule a
   meeting shortly before the hearing, but completely neglected to address the
   alleged failure by DCPS to perform necessary evaluations and to develop an
   appropriate Individualized Education Program ("IEP") for M.P. for years before
   hearing.

Respectfully submitted,

/s/ _____
Douglas Tyrka, #467500
2807 27th St., NW
Washington, DC  20008
(202) 332-0038

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                              )
**ALICE PEAK,**                               )
                    **Plaintiff,**            )
                                              )       **Civil Action No. 05-1912**
**v.**                                        )       **JGP**
                                              )
**DISTRICT OF COLUMBIA**                      )
                    **Defendant.**            )
_____)


**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

This case involves a claim for injunctive relief brought under the Individuals with

Disabilities Education Act, 20 U.S.C § 1400 et seq.[1] In the Complaint, Ms. Peak sought

an injunction ordering the District of Columbia Public Schools ("DCPS") to fund M.P.'s

placement at a private school, to fund independent evaluations of M.P., to revise M.P.'s

Individualized Education Program ("IEP"), and to provide M.P. with compensatory

education for several year's worth of deficiencies in his special education.

Since the filing of the Complaint in this case, DCPS has performed the necessary

evaluations and has revised M.P.'s IEP. Accordingly, Ms. Peak no longer seeks funding

for evaluations.

DCPS has also recently changed M.P.'s school placement. Because that change in

placement is the subject of dispute substantially involving events since the administrative

---

[1] Recent amendments to the IDEA became effective in July 2005, shortly after the filing of the
administrative complaint in this case. For that reason, all references to the IDEA in this Memorandum refer
to the older version of the law, 105 P.L. 17. The references to the statute refer to it as it was codified at 20
U.S.C. § 1400 et seq. The public law version is numbered 600 et seq., so § 1412 corresponds to § 612, etc.
The federal regulations implementing the IDEA have not yet been changed, and remain published at 34
C.F.R. § 300 et seq.

hearing in this case, Ms. Peak is no longer requesting funding for a private placement as part of this case.

Ms. Peak is still requesting an injunction ordering DCPS to develop an appropriate compensatory education plan to compensate M.P. for their failure to provide him with a free appropriate public education prior to the administrative hearing in this case.

## FACTUAL BACKGROUND

M.P. is a nine-year-old boy who qualifies for services under the IDEA as a child with mutliple disabilities.[2] See 20 U.S.C. § 1402(3)(A)(defining child with a disability); Exhibit 2 at 1. M.P.'s most recent Individualized Education Program ("IEP") prescribes 29.5 hours per week of specialized instruction, 1.5 hours per week of counseling, and 1 hour per week of speech/language therapy. Exhibit 2 at 1.

M.P., who is currently in the fourth grade, has been attending Malcolm X Elementary School ("Malcolm X"), a DCPS school, since pre-kindergarten. R. 30.

On April 11, 2003, M.P.'s teacher documented M.P.'s "sudden and disruptive conduct in all classes and his inability to concentrate or produce any acceptable first grade work." Exhibit 3 at 3. On June 17, 2003, M.P.'s teacher stated that M.P. had "continued his slide 'down-hill,'" and recommended that he "be given social support services for grief and anger management." Exhibit 3 at 3.

Following the 2003-2004 school year, DCPS promoted M.P. to the third grade despite the fact that he could not read. R. 31.

DCPS did not evaluate M.P. for special education until July 9, 2004. R. 17.

---

[2] DCPS initially classified M.P. as learning disabled.  However, from recent evaluations M.P. has been determined to be emotionally disturbed as well, thus qualifying him as a child with Multiple Disabilities under the IDEA.

In July 2004, DCPS completed a psychoeducational evaluation, a speech/language evaluation, and a social history of M.P. R. 17, 25, 28. On August 12, 2004, DCPS developed an initial IEP for M.P. R. 35. The initial IEP classified M.P. as a child with a learning disability, prescribed for him fifteen hours per week of specialized instruction and one hour per week of speech and language therapy, and continued his school placement at Malcolm X. R. 35, 45.

At the August 12, 2004 meeting, Ms. Peak specifically requested that M.P. be evaluated for Attention Deficit Hyperactivity Disorder ("ADHD"). R. 33. DCPS did not attempt to perform that evaluation until December 2005. Exhibit 4 at 1.

The social history, completed in July 2004, recommended that M.P. receive socio-emotional counseling. R. 30. Despite that recommendation and the similar recommendation from M.P.'s teacher one year before, DCPS did not prescribe counseling for M.P. until November 2005. Exhibit 3 at 3; R. 30; Exhibit 5 at 5.

The psychoeducational evaluation, completed in July 2004, recommended that M.P. "be referred for an [occupational therapy] evaluation." R. 20. DCPS did not perform an occupational evaluation of M.P. until December 21, 2005. Exhibit 6 at 1.

A Counselor Observation from June 2005 documented numerous incidents of inappropriate behavior by M.P. during the 2004-2005 SY, including excessive yelling and screaming in the classroom, defiance of school rules, general unruliness, frequent movement around the classroom, inappropriate contact with other students, pushing and kicking objects, several fights with other students, and removal from the classroom for disrupting the learning process. Exhibit 7 at 1.

Ms. Peak has made similar observations. The principal, assistant principal, and school counselor called Ms. Peak to Malcolm X on several occasions during the 2004-2005 SY to address M.P.'s behavior. R. 143-50. When Ms. Peak arrived at the school, she routinely discovered M.P. "in the halls running up and down on every floor." R. 145. Ms. Peak soon learned that several members of the staff at Malcolm X ES shared her concerns, including the assistant principal, Mr. Owens, who stated that he was "having a lot of problems [with M.P.]," and M.P.'s teacher, who told Ms. Peak that M.P. was "running around the halls. When he comes in the morning, he throws his book bag in the classroom and she don't see him no more." R. 145-146.

M.P. was suspended by the school on at least two occasions during the second semester of the 2004-2005 school year. R. 146-147. On one of these occasions, a counselor had "dragged him out the school, on the playground" because M.P. had been "running the halls [and] not going to none of his classrooms every day." R. 147. On another occasion, Ms. Peak discovered a school aide holding M.P. by the hand in the hallway. R. 148. When Ms. Peak asked why this was necessary, the aide told her that "because he don't want to go to his classroom . . . he sits there with her, all day." R. 148.

The teacher comments from February 14, 2005 speak of M.P. playing in the halls most mornings instead of going to homeroom. Exhibit 8 at 1. The comments from May 9, 2005 indicate that M.P. "often plays in the hall instead of reporting to class." R. 56.

Despite the many indications of emotional and behavioral issues listed above, DCPS did not conduct any emotional or behavioral evaluations of M.P. until several months after the filing of the administrative complaint relevant to this case.

Shortly after the conclusion of the 2004-2005 school year, Ms. Peak filed a due process complaint against DCPS. R. 8. That complaint, filed on June 29, 2005, alleged that DCPS had failed to perform necessary evaluations, had failed to develop and implement an appropriate IEP, and had failed to provide an appropriate school placement, among other things, and requested as relief that DCPS "fund independent clinical, functional behavioral, occupational therapy, and social history evaluations" of M.P., place him at Ms. Peak's choice of school, develop an appropriate IEP, and provide compensatory education. R. 11.

An administrative hearing was held on August 23, 2005. R. 2. In a Hearing Officer's Determination issued on August 30, 2005 ("HOD"), the Hearing Officer dismissed all of Ms. Peak's claims. R. 6.

In the HOD Discussion and Conclusions of Law, the Hearing Officer held that Malcolm X had invited Ms. Peak to a Multidisciplinary Team ("MDT") meeting in June, 2005, but that Ms. Peak's administrative counsel, Carolyn Houck, had "frustrated the process" of conducting the meeting. R. 5-6. In the Discussion and Conclusions of Law, the Hearing Officer did not address the questions of whether M.P.'s evaluations were current and adequate, and whether DCPS had developed an appropriate IEP and determined an appropriate school placement for M.P. R. 5-6.

Following the administrative hearing and the filing of the Complaint in this case, Malcolm X convened an MDT meeting on November 7, 2005. Exhibit 5 at 1. At that meeting, the team determined that M.P. needed a clinical psychological evaluation, an occupational therapy evaluation, and a functional behavioral assessment, the same evaluations Ms. Peak had requested at the August 23, 2005 hearing. Exhibit 5 at 2; R. 11.

By December 8, 2005, DCPS had not provided Ms. Peak with any of the evaluations determined necessary at the November 7, 2005 meeting, and had not proposed any new placement for M.P. On December 8, 2005, Ms. Peak filed a new due process complaint. Exhibit 9 at 1.

DCPS completed a clinical evaluation on December 1, 2005, an occupational therapy evaluation on December 21, 2005, a functional behavioral assessment on January 4, 2006, and an educational evaluation on January 13, 2006. Exhibits 1, 4, 6 and 10.

The clinical evaluation determined that, "[i]n addition to his current Learning Disability classification,…[M.P.] also meets criteria for a classification of Emotional Disturbance, rendering him eligible for Multiple Disability Classification." Exhibit 4 at 5.

The functional behavioral assessment confirmed that M.P. "requires a small-structured environment with therapeutic intervention and support." Exhibit 10 at 1.

M.P.'s performance on the tests in the educational evaluation placed him in the 4th percentile of children at his grade level. Exhibit 1.

On January 17, 2006, DCPS convened an MDT meeting to review and revise M.P.'s IEP and to determine an appropriate placement for him. Exhibits 2, 11-13. At that meeting, the MDT determined that M.P. needs a full-time, therapeutic special education placement. Exhibit 11; Exhibit 12 at 3; Exhibit 13. However, DCPS continued M.P.'s placement at Malcolm X over the objection of Ms. Peak's representative. Exhibits 11, 13. Since performing the evaluations, DCPS has developed an IEP for M.P. that classifies him as emotionally disturbed as well as learning disabled, includes goals and objectives addressing his emotional issues, includes a behavior intervention plan, and prescribes a

full-time, therapeutic placement. Following the development of that IEP, DCPS has now transferred M.P. to a full-time special education placement. Exhibit 14.

## STATUTORY FRAMEWORK

The Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq. ("IDEA"), guarantees "that all children with disabilities have available to them free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A); 34 C.F.R. § 300.300. "Free appropriate public education" ("FAPE") means special education and related services provided at public expense, which "include an appropriate preschool, elementary school, or secondary school education," meet state standards, and "are provided in conformity with the individualized education program[.]" 20 U.S.C. § 1415(9).

Each state (including the District of Columbia[3]) accepting federal funds under the IDEA assumes several obligations, including: (1) to identify and fully evaluate every child suspected of having a disability; and (2) to develop an appropriate Individualized Education Plan ("IEP") for each qualified child on an annual basis. 20 U.S.C. §§ 1412(a)(3)(A), 1414(a)(1)(A), 1414(b)(3)(B), and 1414(d)(4)(A); 34 C.F.R. §§ 300.320, 300.342-347, 300.531-300.533; see Honig v. Doe, 484 U.S. 305, 311 (1988) ("The primary vehicle for implementing these congressional goals is the [IEP.]…Prepared at meetings between a representative of the local school district, the child's teacher, the parents or guardians, and, whenever appropriate, the disabled child, the IEP sets out the child's present educational performance, establishes annual and short-term objectives for

---

[3] For purposes of the IDEA "[t]he term State means each of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, and each of the outlying areas." 20 U.S.C. § 1402 (31).

improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.").

Congress has also afforded parents several procedural safeguards. <u>See</u> 20 U.S.C. § 1415. Among them are the right to a "due process hearing," and a provision allowing that "any party aggrieved by the findings and decision [at such a hearing] shall have the right to bring a civil action with respect to the complaint presented . . . in a district court of the United States without regard to the amount in controversy."  20 U.S.C. § 1415(i)(2)(A). In such a proceeding, the focus of a reviewing court's inquiry is two-fold:  (1) whether the state has complied with the procedural requirements of the Act; and (2) whether the IEP developed through these procedures is "reasonably calculated to enable the child to receive educational benefits." <u>Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley</u>, 458 U.S. 176, 206-207 (1982).

The federal regulations require that an IEP be developed "within 30 days of a determination that the child needs special education and related services." 34 C.F.R. 300.343(b). Until November 13, 2003, District of Columbia law required that "the District of Columbia Public Schools . . . assess or evaluate a student, who may have a disability and who may require special education services, within 60 days from the date that the student was referred for an evaluation or assessment." D.C. Law 12-175, § 602 (formerly codified at D.C. Code § 31-1861a(a)-(b)). Effective November 13, 2003, the relevant District of Columbia law required that evaluations be completed "within 120 days from the date that the student was referred for an evaluation or assessment." D.C. Code § 38-2501(a).

8

Recent amendments to the IDEA became effective in July 2005, shortly after the filing of the administrative complaint in this case. For that reason, all references to the IDEA in this brief refer to the older version of the law, 105 P.L. 17. The references to the statute refer to it as it was codified at 20 U.S.C. § 1400 et seq. The public law version is numbered 600 et seq., so § 1412 corresponds to § 612, etc. The federal regulations implementing the IDEA have not yet been changed, and remain published at 34 C.F.R. § 300 et seq.

## SUMMARY JUDGMENT STANDARD

In general, summary judgment is appropriate when the record as a whole shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

When considering a motion for summary judgment, a trial court must draw all justifiable inferences in the non-moving party's favor, but the non-moving party may not rely on mere conclusory allegations, and "must present significant probative evidence tending to support" its position. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Unlike typical judicial review of administrative action, in suits filed under the Individuals with Disabilities Act ("IDEA") following an administrative hearing, the court bases its decision on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(B)(iii). The "IDEA plainly suggests less deference than is conventional in administrative proceedings." Reid ex rel. Reid v. District of Columbia, 401 F.3d 516, 521 (D.C. Cir. 2005) (internal quotations omitted). The Plaintiff must persuade the court that the hearing

officer was wrong, and the court must explain its basis for ruling against the hearing

officer. <u>See Kerkam v. McKenzie</u>, 862 F.2d 884, 887 (D.C. Cir. 1988).

However, in IDEA due process hearings in the District of Columbia, DCPS "shall

bear the burden of proof, based solely upon the evidence and testimony presented at the

hearing, that the action or proposed placement is adequate to meet the educational needs

of the student." D.C. Mun. Regs. tit. 5 § 3030.3.

<b>ARGUMENT</b>

**I.    THE HEARING OFFICER IMPROPERLY DISMISSED THE
PLAINTIFF'S CLAIMS REGARDING DCPS' FAILURE TO PERFORM
NECESSARY EVALUATIONS AND FAILURE PROPERLY TO
EDUCATE M.P. PRIOR TO JUNE 20, 2005**

As recounted above, in the HOD the Hearing Officer determined that DCPS had

attempted to convene a Multidisciplinary Team ("MDT") meeting on June 20, 2005, but

that Ms. Peak failed to participate. For that reason, the Hearing Officer dismissed all of

Ms. Peak's claims.

The Hearing Officer's findings do not support the dismissal of Ms. Peak's claims

regarding DCPS' failure properly to evaluate M.P. and to educate him for years prior to

the hearing. At most, the Hearing Officer's finding that Ms. Peak interfered with the June

20, 2005 meeting negates Ms. Peak's claims for DCPS' violations starting at that date.

In the HOD, the Hearing Officer did not contend that Ms. Peak's failure to

participate in the June 20, 2005 meeting somehow negated DCPS' prior violations.

Instead, the Hearing Officer simply failed to address those claims. The Hearing Officer

made no finding regarding the need for evaluations, and no finding regarding the

appropriateness of M.P.'s IEP and school placement.

This failure is striking given that Ms. Peak had requested as relief, in addition to immediate placement and the revision of the IEP, funding for evaluations and a meeting to develop a compensatory education plan for the past violations. Ms. Peak requested that relief both in her administrative complaint and orally at the hearing. R. 11, 184-187, 189.

The Hearing Officer's mistake in dismissing the entirety of the complaint due to the failure to attend a recent meeting is very similar to that in <u>Petway v. District of Columbia</u>, 2005 U.S. Dist. LEXIS 36226 (2005). In that case, the hearing officer found that the parent had signed the most recent IEP, that the school had issued a meeting invitation, and that therefore "the parent's 'preemptive action allowed no opportunity to discuss parental concerns about a new IEP and gave DCPS no opportunity to meet those concerns.'" <u>Id.</u> at 10-11. On that basis, the hearing officer denied all of the parent's claims, including her claims for new evaluations. <u>Id.</u> at 2.

In its review of the hearing officer's determination, the court in <u>Petway</u> noted that the hearing officer had failed to present any discussion of law regarding the need for evaluations, the appropriateness of the IEP, and the appropriateness of the school placement. <u>Id.</u> at 21. The Discussion and Conclusions of Law in the HOD before this Court is similarly silent as to all of those issues.

"While the Court must give "due weight" to the Hearing Officer's decision, a decision without reasoned and specific conclusions deserves little deference." <u>Id.</u> at 22-23 (citing <u>Reid v. District of Columbia</u>, 401 F.3d 516, 521 (D.C. Cir. 2005); <u>Lyons v. Smith</u>, 829 F. Supp. 414, 418 (D.D.C. 1993).

The Hearing Officer's finding that Ms. Peak had failed to participate in a recent meeting may arguably negate a claim for failure to develop an IEP and to determine a

placement from the date of that meeting. However, it in no way excuses DCPS' failure to comply with the IDEA for months and years prior to that date.

## II.    DCPS FAILED TIMELY TO PERFORM INITIAL EVALUATIONS OF M.P.

At all times relevant to this case, the IDEA and the implementing regulations required that "[a]ll children with disabilities residing in the State...who are in need of special education and related services, are identified, located, and evaluated[.]" 34 C.F.R. § 300.125.

As early as the spring of 2003, at the latest, DCPS was on notice, from its own teachers, that M.P. was in need of evaluation for special education. Nonetheless, they failed to perform any evaluations at all until the summer of 2004.

On April 11, 2003, M.P.'s teacher documented that M.P.'s behavioral issues were interfering with his education, and recommend a school conference to develop a plan for him. Exhibt 3 at 3. On June 17, 2003, M.P.'s teacher noted that the conference had not been held and that M.P. continued to decline, and recommended counseling and extended school year education. Exhibit 3 at 3.

Following the 2003-2004 school year, DCPS promoted M.P. to the third grade despite the fact that he could not read. Exhibit 5 at 1.

Despite these very clear notices of M.P.'s special needs, DCPS failed to perform any evaluations of M.P. until the summer of 2004. Consequently, he did not have an IEP, and therefore received no special education or related services, until August 2004.

**III.     DCPS FAILED TIMELY TO PERFORM A CLINICAL PSYCHOLOGICAL EVALUATION AND A FUNCTIONAL BEHAVIORAL ASSESSMENT OF M.P.**

At all times relevant to this case, the IDEA required that special needs children be "assessed in all areas of suspected disability[.]" 20 U.S.C. § 1414(b)(3)(B).

In addition to DCPS' knowledge of M.P.'s need for special education evaluations generally, DCPS knew or should have known that M.P. was specifically in need of behavioral evaluations (a clinical psychological evaluation and a functional behavioral assessment) as early as the spring of 2003, and at several points thereafter. Nonetheless, DCPS failed to perform those evaluations until December 2005 and January 2006.

On April 11, 2003, M.P.'s teacher documented M.P.'s "sudden and disruptive conduct in all classes and his inability to concentrate or produce any acceptable first grade work." Exhibit 3 at 3. On June 17, 2003, M.P.'s teacher stated that M.P. had "continued his slide 'down-hill,'" and recommended that he "be given social support services for grief and anger management." Exhibit 3 at 3.

A social history evaluation completed in July 2004 recommended that M.P. receive socio-emotional counseling, and further recommended "an educational environment that would allow him to receive plenty of attention." R. 30.

At the August 2004 MDT meeting, Ms. Peak specifically requested that M.P. be evaluated for Attention Deficit Hyperactivity Disorder. R. 33.

During the 2004-2005 school year, M.P.'s teacher noted that "[M.P.] plays in the hall most mornings instead of coming to homeroom.…He often plays in the hall instead of reporting to class."

A Counselor Observation form from June of 2005 documented numerous incidents of inappropriate behavior by M.P. during the 2004-2005 school year, including excessive yelling and screaming in the classroom, defiance of school rules, general unruliness, frequent movement around the classroom, inappropriate contact with other students, pushing and kicking objects, several fights with other students, and removal from the classroom for disrupting the learning process. Exhibit 7 at 1.

The school counselor called Ms. Peak to M.P.'s school on several occasions during the 2004-2005 school year to discuss M.P.'s behavior with the principal and assistant principal. R. 143-150. When Ms. Peak arrived at the school, she routinely discovered M.P. "in the halls running up and down on every floor." R. 145. Ms. Peak learned that several members of the staff at the school shared her concerns, including the assistant principal, Mr. Owens, who stated that he was "having a lot of problems [with M.P.]," and M.P.'s teacher, who told Ms. Peak that M.P. was "running around the halls. When he comes in the morning, he throws his book bag in the classroom and she don't see him no more." R. 145-146.

M.P. was suspended by the school at least twice during the second semester of the 2004-2005 school year. R. 146-147. On one of these occasions, a counselor had "dragged him out the school, on the playground" because M.P. had been "running the halls [and] not going to none of his classrooms every day." R. 147. On another occasion, Ms. Peak discovered a school aide holding M.P. by the hand in the hallway. R. 148. When Ms. Peak asked why this was necessary, the aide told her that "because he don't want to go to his classroom . . . he sits there with her, all day." R. 148.

Despite the requests from Ms. Peak and M.P.'s teacher that M.P.'s behavioral issues be addressed, and the mounds of evidence accumulated over the years that M.P. had serious behavioral issues that were interfering with his education, DCPS made no attempt to perform behavioral evaluations until December 2005, several months after Ms. Peak filed the administrative complaint in this case. Exhibit 4 at 1.

Those evaluations leave no more question as to M.P.'s behavioral issues. The clinical evaluation report from December 1, 2005 recommended classifying M.P. as emotionally disturbed in addition to learning disabled. Exhibit 4 at 5. The functional behavioral assessment completed on January 4, 2006 states that M.P. "requires a small-structured environment with therapeutic intervention and support." Exhibit 10 at 1.

As a direct result of those evaluations, M.P.'s IEP was greatly modified and his school placement changed. Exhibit 2 at 1, 7-11.

## IV. DCPS FAILED TO DEVELOP AN APPROPRIATE IEP M.P. AND TO PROVIDE AN APPROPRIATE SCHOOL PLACEMENT FOR M.P.

The IDEA requires that DCPS fully evaluate every potentially qualified child in all areas of suspected disability and develop an appropriate Individualized Education Plan ("IEP") for each qualified child on an annual basis. 20 U.S.C. §§ 1414(a)(1)(A) and 1414(d)(4)(A); 34 C.F.R. §§ 300.320, 300.342-347, 300.531-300.533; see Honig v. Doe, 484 U.S. 305, 311 (1988) ("The primary vehicle for implementing these congressional goals is the [IEP.]…Prepared at meetings between a representative of the local school district, the child's teacher, the parents or guardians, and, whenever appropriate, the disabled child, the IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the

specially designed instruction and services that will enable the child to meet those objectives.").

To be deemed appropriate, this IEP must developed in accordance with the procedural requirements of the Act and must be "reasonably calculated to enable the child to receive educational benefits." Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206-207 (1982).

As argued above, Argument II, DCPS failed to develop an IEP or to provide M.P. with any special education at all until August 2004, more than one year after DCPS personnel specifically identified his special needs.

As argued above, Argument III, it was clear from the start that M.P.'s problems were largely, if not primarily, behavioral. Nonetheless, DCPS failed to evaluate M.P. for emotional and behavioral concerns until December 2005 and January 2006, almost three years after the first documented record of those issues, and only after Ms. Peak had filed two administrative complaints and one federal complaint for DCPS' failure to perform those evaluations.

DCPS' failure to perform those evaluations clearly resulted in inappropriate IEPs and an inappropriate school placement. Since performing the evaluations, DCPS has developed an IEP for M.P. that classifies him as emotionally disturbed as well as learning disabled, includes goals and objectives addressing his emotional issues, includes a behavior intervention plan, and prescribes a full-time, therapeutic placement. Following the development of that IEP, DCPS has now transferred M.P. to a full-time special education placement.

As a result of DCPS' failure to evaluate M.P. over the years, DCPS completely denied M.P. his right to an IEP and a special education placement for over one year, from spring 2003 to August 2004, and denied him his right to an appropriate IEP and placement for 18 months after that, from August 2004 through January 2006.

## V.   M.P. IS ENTITLED TO COMPENSATORY EDUCATION FOR DCPS' FAILURE TO PROVIDE HIM WITH A FAPE FOR YEARS

"When a school district deprives a disabled child of free appropriate public education in violation of the Individuals with Disabilities Education Act, a court fashioning 'appropriate' relief, as the statute allows, may order compensatory education[.]" Reid ex rel. Reid v. District of Columbia, 401 F.3d 516, 518 (D.C. Cir. 2005).

At the time of the administrative hearing, M.P. had been denied any IEP and special education placement for the entire 2003-2004 school year. Because the IEP finally developed and the placement at Malcolm X, both based on insufficient evalations, were plainly inappropriate, M.P. effectively received no education for the entire 2004-2005 school year as well.[4]

There could hardly be any question that M.P.'s education suffered as a result, and the record leaves none. At the end of the 2003-2004 school year, when M.P. was seven years old, and had not received any special education, he still could not read.

According to the June 2005 Counselor Observation Form, during the 2004-2005 school year, M.P.'s numerous behavioral incidents resulted in his removal from the classroom. During that year, he was often found "in the halls running up and down on every floor." R. 145-146. As a result of these incidents, he was suspended multiple times.

---

[4] Unfortunately, M.P.'s inappropriate IEP and placement continued well into the 2005-2006 school year as well, but that fact was of course not a subject in the administrative action in this case.

According to the most recent testing, after one and one half school years receiving special education at Malcolm X under the inappropriate IEP, M.P. is performing in the 4th percentile of children in his grade level.

Most disturbing by far, however, is the decline in M.P.'s emotional health and his behavior during his time at Malcolm X. M.P. has declined from the spring of 2003, when he was a child with concentration and control problems, to the 2004-2005 school year, when he was regularly disrupting class, avoiding class, or being removed from class, finally to the fall of 2005, when he was regularly fighting, and was having homicidal and suicidal thoughts. Exhibit 3 at 3; Exhibit 5 at 4-5; Exhibit 7 at 1; R. 143-150.

At the time of the hearing, because DCPS had still not performed the emotional and behavioral evaluations, it was impossible to determine exactly what compensatory education would be appropriate to compensate M.P. for his lost FAPE. For that reason, Ms. Peak requested at the hearing that DCPS be ordered to convene a meeting to develop an appropriate plan, and Ms. Peak accordingly requests that this Court order that relief. R. 189. However, if the Court prefers to resolve the issue finally, Ms. Peak would request that the Parties be ordered to brief the question of the exact compensatory education warranted, with appropriate affidavits from experts.

## CONCLUSION

DCPS failed properly to evaluate M.P. and to provide him with an appropriate education for years, despite clear evidence of his needs, primarily from DCPS' own documents. The Hearing Officer found that Ms. Peak (or more accurately, Ms. Houck) was responsible for DCPS' failure to meet those needs during the few weeks before the

hearing, and on that basis, dismissed the entirety of Ms. Peak's claims for the years of violations.

DCPS' attempt on June 20, 2006 to begin the actions they should have performed in 2003 does not excuse them from their responsibility to educate M.P., and does not invalidate Ms. Peak's claim for compensatory education designed to full remedy their failures.

For all of the foregoing reasons, the Court should order DCPS to develop and appropriate compensatory education plan to compensate M.P. for DCPS' failure to provide him a FAPE since spring 2003.

Respectfully submitted,

/s/_____
Douglas Tyrka, #467500
2807 27th St., NW
Washington, DC  20008
(202) 332-0038

19

# TABLE OF AUTHORITIES

## Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).....................................................10
Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, 458
U.S. 176 (1982)..........................................................................................................9, 17
Honig v. Doe, 484 U.S. 305 (1988)..................................................................................8, 16
Kerkam v. McKenzie, 862 F.2d 884 (D.C. Cir. 1988)........................................................11
Lyons v. Smith, 829 F. Supp. 414 (D.D.C. 1993)……………………………………12
Petway v. District of Columbia, 2005 U.S. Dist. LEXIS 36226 (2005)…………………12
Reid ex rel. Reid v. District of Columbia, 401 F.3d 516 (D.C. Cir. 2005)…………..10, 18

## Statutes and Regulations

20 U.S.C. § 1400..............................................................................................................2, 8
20 U.S.C. § 1402..............................................................................................................3, 8
20 U.S.C. § 1412.................................................................................................................8
20 U.S.C. § 1414.......................................................................................................8, 14, 16
20 U.S.C. § 1415.......................................................................................................8, 9, 10
34 C.F.R. § 300.125...........................................................................................................13
34 C.F.R. § 300.300............................................................................................................8
34 C.F.R. § 300.320......................................................................................................8, 16
34 C.F.R. § 300.342...................................................................................................8, 9, 16
34 C.F.R. § 300.343...................................................................................................8, 9, 16
34 C.F.R. § 300.344...................................................................................................8, 9, 16
34 C.F.R. § 300.345...................................................................................................8, 9, 16
34 C.F.R. § 300.346...................................................................................................8, 9, 16
34 C.F.R. § 300.347...................................................................................................8, 9, 16
34 C.F.R. § 300.531......................................................................................................8, 16
34 C.F.R. § 300.532......................................................................................................8, 16
34 C.F.R. § 300.533......................................................................................................8, 16
D.C. Code § 38-2501…………………………………………………………………9
D.C. Mun. Regs. tit. 5 § 3030.3.........................................................................................11
D. C. Law 12-175 § 602…………………………………………………………………...9

Key to Exhibits

Exhibit 1        1/13/06 Educational Evaluation
Exhibit 2        1/17/06 IEP
Exhibit 3        2002-2003 Report Card and Teacher Comments
Exhibit 4        12/01/05 Clinical Evaluation
Exhibit 5        11/07/05 MDT Meeting Notes
Exhibit 6        12/21/05 Occupational Therapy Evaluation
Exhibit 7        June 2005 Counselor Observation
Exhibit 8        2004-2005 Teacher Comments
Exhibit 9        12/08/05 Due Process Complaint Notice
Exhibit 10       1/04/06 Functional Behavioral Assessment
Exhibit 11       1/17/06 DCPS Prior Notice
Exhibit 12       1/17/06 MDT Meeting Notes
Exhibit 13       1/17/06 Advocate's MDT Meeting Notes
Exhibit 14       4/21/06 DCPS Prior Notice